THE PEOPLE OF THE STATE OF NEW YORK ex rel. JOHN W. McCLELLAND, Appellant, v. JAMES A. ROBERTS, as Comptroller of the State of New York, Respondent.

91 101
148a 360
91 101
14ap487
91 101
152a 355
91 101
f44ap472
45ap 75

*Civil Service Act — applies to the Department of Public Works — construction of a Constitution, upon what based — facts presumed to be known to its framers — pre-existing civil service laws are still in force — determination as to whether such laws can be applied to a department, by whom made.*

An amended Constitution must read as a whole and as if every part had been adopted at the same time.

The first rule in interpreting and construing a Constitution is to give to it the meaning and effect contemplated by its framers and by the people who adopted it, and this is to be gathered, if possible, from the plain and ordinary meaning of the words used.

The intent is to be discovered, not alone by considering the words of any one part, but by ascertaining the general purpose of the whole and by considering the evil which existed, calling for the new enactment, and the remedy which was sought to be applied.

Where a new Constitution contains some provisions of a former Constitution and also provisions which are new, the same rules of construction must govern which apply to amendments to an existing Constitution.

The history of a Constitution and the conditions and circumstances attending its adoption may be examined in determining its intent, as well as the laws previously existing and the evils intended to be cured, and resort may also be had to the proceedings and debates of the convention which framed the Constitution.

The framers of a new Constitution will be presumed to have known the method by which employees in the civil service of the State were appointed in the past, that a law had been enacted to remedy defects in the former method of appointment, that the execution of that law had been intrusted to the Governor of the State, that he had acted under the law, and that the Court of Appeals had decided that the law did not apply to the Department of Public Works, and that the action of the Governor was unauthorized.

It was the intention of the framers of the new Constitution to limit by section 9 of article 5 thereof the power of appointment, given to the Superintendent of Public Works by section 3 of said article, and to make his appointees subject to the provisions of chapter 354 of the Laws of 1883, known as the Civil Service Law.

The provisions in said section 9, directing that appointments in the civil service shall be made "according to merit and fitness, to be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive," followed by the further direction in said section, "laws shall be made to provide for the enforcement of this section," do not lay section 9 open to the objection that it is not self-executing.

This section must be read in connection with section 16 of article 1, which latter section continues in force existing laws until the same are altered by the Legislature, and, in view of the fact that the present laws relative to the civil service are in harmony with the new Constitution, those laws can be used so far as they suffice, and, to the extent that they are sufficient, will have the same force as if they had been enacted after the new Constitution went into effect.

Under the Civil Service Law in force at the time when the present Constitution was adopted, the Governor was authorized to determine how far it was practicable to test the merit and fitness of candidates for places in the public service by examination, and, as the new Constitution contemplates the same method, the courts will assume that the framers of the new Constitution relied upon the existing civil service acts to enforce the provisions of said section 9.

In this view it is not necessary for the Legislature to determine, in the first instance, whether it is practicable to ascertain the merit and fitness of appointees to positions in the Department of Public Works by examination, and the fact that the Legislature has not done this does not exempt that department from the provisions of said section 9.

Where it appears that the Governor has, since the new Constitution went into effect, determined that it is practicable to test by examination the merit and fitness of candidates for positions in the Department of Public Works, and has made a classification of the positions in the Department of Public Works, and a list has been prepared of persons eligible to such positions, it is the duty of the Superintendent of Public Works to make an appointment to a position, covered by such list, from the persons whose names are upon that list.

APPEAL by the relator, John W. McClelland, from an order of the Supreme Court, made at the Albany Special Term and entered in the office of the clerk of the county of Albany on the 15th day of July, 1895, denying his motion for a mandamus to compel the Comptroller to audit and pay his claim for salary as clerk to the collector of canal statistics for the month of May, 1895.

*Myer Nussbaum*, for the appellant.

*Matthew Hale*, for the respondent.

MAYHAM, P. J.:

On the 26th day of April, 1895, George W. Aldridge, Superintendent of Public Works, delivered to the relator an appointment in writing appointing him a clerk to the collector of canal statistics at Albany at a salary of sixty-five dollars per month.

The case discloses that the relator duly qualified and entered upon the discharge of the duties as clerk under this appointment on the 1st day of May, 1895, and continued in the discharge of his duties as

such clerk for more than one month and until the time of his application to the defendant for the payment of a month's salary, and that, on the fifteenth day of June, he demanded of the Comptroller the payment of sixty-five dollars as salary for the month of May, and that the defendant, as Comptroller, refused to audit and pay the same, and that he still continues to refuse to audit and allow such claim.

On such proof, and on other affidavits, and the certificate of his appointment, the relator applied to the court for an order to show cause why a peremptory mandamus should not be issued, compelling the Comptroller to audit and allow the relator's claim for the salary claimed to be due him, as such clerk, for the month of May.

On the return of such order to show cause, it appeared that the relator had not subjected himself to an examination before the Civil Service Commissioners, and that his name did not appear upon the eligible list for appointments under the laws, rules and regulations which had been adopted, fixing the qualifications of clerks and employees in the civil service of this State.

Upon such hearing, the learned judge at the Special Term denied relator's application for a peremptory writ of mandamus, and from the order denying such application the relator appeals to this court.

The principal point upon which the decision and determination of the learned judge at Special Term turned, seems to be as to the effect that must be given to section 9 of article 5 of the Constitution of 1895, as qualifying or modifying the effect of section 3 of that article, under the provisions of which the last-mentioned section (which existed in the Constitution of 1876), had been held in *The People ex rel. Killeen* v. *Angle* (109 N. Y. 564) not to apply to appointees of the Superintendent of Public Works, and that such appointees were not subject to civil service examination.

The learned judge at Special Term holds that the provision of section 3 of article 5, as it existed in the Constitution of 1876, which is re-enacted in the Constitution of 1895, was so far modified by the provisions of section 9 of article 5 of the last-mentioned Constitution as to bring the department of public works under the operation of the Civil Service Laws.

This conclusion of the learned judge at Special Term is fortified by such cogent and, as appears to us, unanswerable reasons that it

commends his conclusions as the true interpretations of section 3 of article 5, as qualified by section 9 of the same article in the Constitution of 1895.

As the whole subject was elaborately discussed by the learned judge at Special Term, we think the order should be affirmed on his opinion.

PUTNAM, J., concurred; HERRICK, J., not acting.

Order affirmed, with costs and disbursements.

The following is the opinion of the Special Term:

HERRICK, J.:

This is an application for a writ of peremptory mandamus, to be directed to the Comptroller of the State of New York, commanding him to draw his warrant for the payment of the salary of the relator, as clerk to the collector of canal statistics, for the month of May, 1895.

It appears that on the 26th of April, 1895, the Superintendent of Public Works issued a commission to the relator, under his hand and seal, in the words following:

"ALBANY, *April* 26, 1895.

"By virtue of the power vested in me by section 3 of article 5 of the Constitution of the State of New York, I do hereby appoint J. W. McClelland, of Albany, N. Y., clerk to collector of canal statistics, at Albany, N. Y.; salary $65 per month."

The relator had passed no civil service examination for the position in question, and his name was not certified to the Comptroller by the Civil Service Commission of the State.

The Comptroller bases his refusal to draw his warrant for the payment of the salary of the relator upon chapter 354 of the Laws of 1883, as amended by chapter 681 of the Laws of 1894, which provides for arranging in classes the clerks and other employees in the public service of the State, and for the certification to the Comptroller by the Civil Service Commission of the names of all officers, clerks or other persons appointed to the public service of the State, from either of said classes, and prohibits the Comptroller from drawing his warrant for the payment of any salary or compensa-

tion to any officer, clerk or other person in the public service whose name has not been so certified to him.

The relator contends that the law in question is not applicable to his case, and that there is no necessity for his name being certified to the Comptroller by the Civil Service Commission of the State, because, as he alleges, under the laws and Constitution of the State, the appointees of the Superintendent of Public Works are not subject to the Civil Service Laws, but the power of appointment is lodged exclusively in such superintendent, untrammeled by any laws, rules or regulations whatever.

The position taken by the parties to this proceeding makes it necessary to examine not only the Civil Service Laws of the State but the Constitution, not only as it is, but as it was prior to January 1, 1895.

The questions presented are of grave importance, seriously affecting the civil service of the State, and the administration of some of its greatest and most important departments, as well as the title to office of many subordinate officers of the State, and, therefore, merit a careful consideration.

In 1876, the then existing Constitution was amended by creating an entirely new official known as "a Superintendent of Public Works," to whom was confided the execution of all laws "relating to the repair and navigation of the canals, and also of those relating to the construction and improvement of the canals, except so far as the execution of the laws relating to such construction or improvement shall be confided to the State Engineer and Surveyor."

Being thus made responsible for the care and maintenance of the canals, he was given a corresponding power in the selection of his subordinates. After providing for the appointment by him of three assistant superintendents, such amendment further provided that "All other persons employed in the care and management of the canals, except collectors of tolls, and those in the department of the State Engineer and Surveyor, shall be appointed by the Superintendent of Public Works, and subject to suspension or removal by him." (Const. § 3, art. 5.)

It may be well to observe in passing that the same year an amendment to the Constitution was adopted, providing for a Superintendent of State Prisons, who should have the superintend-

ence, management and control of all State prisons, and to whom was given the appointment of all the agents, wardens and chaplains of such prisons; and giving to the agents and wardens of each prison the appointment of all officers of such prison, except the clerk; and further providing for the appointment of clerks of prisons by the Comptroller. (Const. § 4, art. 5.)

In 1883, the Legislature, by chapter 354 of the Laws of that year, authorized the Governor, by and with the consent of the senate, to appoint three persons who should constitute a Civil Service Commission. It was made the duty of said commission " to aid the Governor, as he may request, in preparing suitable rules for carrying this act into effect." It was further enacted that such rules should provide, amongst other things, " for open competitive examinations for testing the fitness of applicants for the public service, now classified, or to be classified hereunder."

Section 6 of such law provided that " Within four months after the expiration of the present session of the Legislature it shall be the duty of the Governor to cause to be arranged in classes of the several clerks and persons employed or being in the public service, for the purposes of the examination herein provided for, and he shall include in one or more of such classes, so far as practicable, all subordinate places, clerks and officers in the public service of the State."

Section 7 provided that " After the termination of eight months from the expiration of the present session of the Legislature, no officer or clerk shall be appointed, and no person shall be admitted to or be promoted, in either of the said classes now existing, or that may be arranged hereunder pursuant to said rules, until he has passed an examination or is shown to be specially exempted from such examination in conformity herewith."

That section was amended by chapter 681 of the Laws of 1894, which amendment provided, amongst other things, as follows: " It shall be the duty of the said commission to certify to the Comptroller the name of every officer, clerk or other person in the public service of the State, in either of said classes, appointed or employed therein in pursuance of law and of the rules and regulations made in pursuance of law, stating in each case the title or character of the office or employment, and the date of the com-

mencement of service by virtue thereof; and, in like manner, to certify to the Comptroller, the name of each officer, clerk or other person, in the public service of the State, in either of the said classes, appointed or employed therein in violation of law or of the rules or regulations made in pursuance of law; and to certify to the Comptroller, in like manner, every change occurring in any such office or employment forthwith, on the occurrence of the change. It shall be unlawful for the Comptroller to draw his warrant for the payment of any salary or compensation to any officer, clerk or other person in the public service of the State, in either of said classes, who is not so certified as having been appointed or employed in pursuance of law and of the rules and regulations made in pursuance of law."

It will be observed that the duty of classifying the various officers and employees of the State, and of making rules and regulations providing for the examination of candidates, and other details, is devolved upon the Governor of the State, and that he is to determine how far it is practicable to include in any classification the subordinate places, clerks or officers in the public service of the State; that the Civil Service Commission, so-called, is merely to aid him, as he may request, in the discharge of his duties; that he is in law, and in fact, the responsible head of the civil service of the State; that he is not only to see that the laws are executed, but that he is, in addition, within the limitation of the Constitution and the acts of the Legislature, to make the laws, that is, the rules and regulations, by which the civil service of the State is to be governed.

Pursuant to said act of 1883 the Governor of the State promulgated rules and regulations for the government of the civil service, and made a classification of subordinate places, clerks and officers. Included in the class subject to competitive examination were the subordinates of the Superintendent of Public Works, and of the Superintendent of State Prisons, and, among others, clerkships of the kind to which the relator claims to have been appointed.

The power of the Legislature to make laws, and of the Governor and Civil Service Commission to make rules and regulations which should subject appointees of the Superintendent of Public Works to examinations, and to limit his appointments to those who should pass such examinations and be placed upon the eligible list of the

civil service of the State, was challenged in the case of *The People ex rel. Killeen* v. *Angle* (109 N. Y. 564).

It was there held that it was the intention of the Constitution to confer upon the Superintendent of Public Works the power to select and appoint his subordinates "subject only to his sense of duty and the obligations of his oath of office," and that it plainly intended "to leave to the superintendent, exclusively, the determination of the propriety of such appointments, and the sufficiency of the qualifications possessed by proposed appointees." And that the provisions of chapter 354 of the Laws of 1883, and of the rules and regulations adopted by the Governor and Civil Service Commission, were limitations and restrictions upon such power of appointment by the superintendent, which the Legislature had no power to impose, and that, therefore, his subordinates "do not come under the operation of the act creating the Civil Service Commission."

The principle of that decision applied as well to subordinates of the Superintendent of State Prisons, and of the agents and wardens of each prison, and to the clerks of such prisons to be appointed by the Comptroller.

It will be observed, however, that the Civil Service Law was not declared unconstitutional as a whole, and it can hardly be said to have been declared unconstitutional at all, but simply that it did not and could not include within its operation certain classes of officers; as to all others, it remained upon the statute book a living and effective law, and so remained, with these exemptions from its provisions, down to the 1st of January, 1895.

The new Constitution, adopted in 1894, contains the same provision as to the appointment of subordinates by the Superintendent of Public Works as did the old Constitution. (See § 3, art. 5.) It also contains, however, an entirely new section, being section 9 of article 5, reading as follows: "Appointments and promotions in the civil service of the State, and of all the civil divisions thereof, including cities and villages, shall be made according to merit and fitness, to be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive; provided, however, that honorably discharged soldiers and sailors from the army and navy of the United States in the late civil war, who are citizens and residents of this State, shall be entitled to preference in appoint-

ment and promotion, without regard to their standing on any list from which such appointment or promotion may be made. Laws shall be made to provide for the enforcement of this section."

It is contended by the relator that the same language being used in the present Constitution as in the old, the same interpretation should be given to it; while, on behalf of the Comptroller, it is contended that the power of appointment given by section 3, of article 5, to the Superintendent of Public Works is limited by the provisions of section 9 of the same article.

This conflict makes necessary both an interpretation and a construction of the Constitution as it now is. Some discussion has been indulged in as to whether the present Constitution is a new Constitution or an amended one. To me it seems to be a matter of little consequence whether we consider the present Constitution as an entirely new instrument which came into existence January 1, 1895, or whether we consider it as an amended Constitution; in either event the same rules of construction will govern, for it has been held "that an amended Constitution 'must be read as a whole and as if every part had been adopted at the same time, and as one law, and effect must be given to every part of it, each clause explained and qualified by every other part.'" (*People ex rel. Killeen* v. *Angle*, 109 N. Y. 564–575.)

The first rule in interpreting and construing a Constitution is to give to it the effect and meaning contemplated by its framers and by the people who adopted it. And the first rule for ascertaining what that intent and meaning was, is that it is to be gathered, if possible, from the plain and ordinary meaning of the words used.

"In the construction of constitutional provisions the language used, if plain and precise, should be given its full effect, and we are not concerned with the wisdom of their insertion. As adopted by the People, the intent is to be ascertained, not from speculating upon the subject, but from the words in which the will of the People has been expressed. To hold otherwise would be dangerous to our political institutions. The Constitution is the basis upon which rests that complicated social organization called the State. It must be presumed that its framers understood the force of the language used, and as well, the People who adopted it. * * * The latitude allowed in the construction of legislative acts is out of place,

and would be unwise when interpreting the fundamental law. Leg islation aims at arranging the mechanism of the State for the benefi of its members, and the question of intention, necessarily, is often of great importance and must be open to judicial inquiry; but the Constitution, which underlies and sustains the social structure of the State, must be beyond being shaken or affected by unnecessary construction, or by the refinements of legal reasoning. We may be compelled to have resort to such in the presence of contradictions or of meaningless clauses, but not otherwise." (*The People* v. *Rathbone*, 145 N. Y. 434-438.)

Let us turn to the language of the Constitution. "Appointments and promotions in the civil service of the State, and of all the civil divisions thereof, including cities and villages, shall be made," etc. This language is general, and in itself contains no limitations or restrictions, and is apt language to cover all appointments under the State government without any exception, and "we are not at liberty to presume that the framers of the Constitution or the people who adopted it did not understand the force of language." (*The People* v. *Purdy*, 2 Hill, 31.)

Standing alone there would be no question but that, under the language of section 9 of article 5, just quoted, were included appointments of the kind in question, but we must not lose sight of the rule of construction that all parts of a Constitution must be construed together.

Section 3 of article 5 confers upon the Superintendent of Public Works the power of appointing his subordinates, and, as we have seen, the court of last resort, in construing the same language in the old Constitution, held that that was an untrameled and unrestricted power.

The relator has invoked the rule that, "Where a clause of a Constitution, which has received a settled judicial construction, is adopted in the same words by the framers of another Constitution, it will be presumed that the construction thereof was likewise adopted." (Black's Const. Law, 68.)

Thus these two sections are brought into apparent conflict, and one of the conditions arises mentioned in the case of *The People* v. *Rathbone*, where we are compelled to resort to construction; and when we are, the same rules apply as in construing a statute.

" The intent of the law-maker is to be sought for. When it is discovered it is to prevail over the literal meaning of the words of any part of the law. And this intent is to be discovered, not alone by considering the words of any part, but by ascertaining the general purpose of the whole, and by considering the evil which existed calling for the new enactment, and the remedy which was sought to be applied." (*People ex rel. Jackson* v. *Potter*, 47 N. Y. 375.)

While it is true as a general proposition, as stated above, that where a clause from a former Constitution is adopted in a new Constitution, it is to be given the same construction as was formerly given to it, still I think that that rule is subject to limitations and restrictions. All parts of the Constitution are to be read together, and a construction given to it that will harmonize the several parts with each other ; and in construing a clause of it taken from a pre-existing Constitution we must see whether there are any provisions in the new Constitution different from those in the Constitution from which the clause in question was taken, and which must be read in connection with it, and whether they in any way enlarge, modify, limit or restrict its meaning.

Where the new Constitution contains some provisions of the old Constitution, and some that are new, I apprehend that in construing such provisions, the same rules of construction must govern as apply to amendments to an existing Constitution.

In giving construction to a provision of the Constitution, its history and the conditions and circumstances attending its adoption must be kept in view, and the effect of subsequent amendments are to be determined by the same rules applicable to the interpretation of statutes. (*Sweet* v. *City of Syracuse*, 129 N. Y. 316–330.)

We must examine the history of the provisions in question and the laws as they previously existed, and the evils, if any, that were intended to be cured by such new provision.

We have examined somewhat the history of the law as it existed prior to January 1, 1895, when the new Constitution went into effect. It is to be presumed that in framing the Constitution the convention had in view the then existing laws. (*People* v. *Rathbone*, 145 N. Y. 435–438.)

Under the old Constitution, subordinate clerks, officers and

employees in the civil service of the State were appointed to, and held their positions under radically different laws; some under a law providing for appointments based upon fitness and merit, to be ascertained by examination, while the subordinates in the great department of public works and in the State prisons, embracing a large proportion of all the appointees in the civil service of the State, were wholly exempt from any such test. This anomalous condition of the public service under the law was, of course, known to the framers of the Constitution.

We must also assume that they knew that the Legislature had passed a law with the intention of making all subordinate clerks, officers and employees in the civil service subject to civil service regulations; that it was the apparent intent of such law to include, and its language was sufficient to include, subordinates of the Superintendents of Public Works and of State Prisons; that the Governor of the State so understood the intent of that law, and that he had classified the subordinates and appointees in such departments, and that the court of last resort had held that under the Constitution the Legislature had no power to subject such subordinates and appointees to any such classification, because the same was an attempted limitation upon and restriction of the power of appointment conferred by the Constitution upon the superintendents of such departments.

Bearing these things in mind, it would seem from a reading of these sections of the Constitution, that the framers thereof intended by section 9 of article 5 to limit or modify the power of appointment conferred on the Superintendent of Public Works by section 3 of such article, and that the power of appointment conferred by section 3 is to be exercised subject to the principles declared in section 9.

If, however, these considerations are not sufficient to render the meaning and intent of the Constitution entirely clear, there are other methods of arriving at the meaning of its framers and of the people who adopted it, to which we may resort, and those are, by reading and considering the proceedings and debates of the convention which framed the instrument under consideration.

The proceedings of a constitutional convention are not always to be relied upon to determine the intent with which any portion of such Constitution was adopted. Different members of such conven-

tion may have diverse reasons for voting for its adoption; and it is sometimes impossible to find from such proceedings that the members united upon any single reason, or had a common intent concerning such clause in the Constitution. (*Legal Tender Case,* 110 U. S. 421–443.)

Still the proceedings of constitutional conventions have always been resorted to by the courts, not as conclusive and binding upon them, but as persuasive aids to assist them in determining the true intent and meaning of the instruments framed by such conventions.

" One mode of construing this section is to take the Constitution as we find it, without reference to the manner in which its different parts were proposed and adopted; and another is to look at the proceedings of the convention, and endeavor thereby to discover the probable intention of the framers of the Constitution, as we now find it. In either case we must also look at the actual state of things which existed when the Constitution was framed and adopted." (*Clark* v. *The People,* 26 Wend. 599; *People* v. *Purdy,* 2 Hill, 31.)

And, "where the proceedings point out the purposes of the provisions, the aid will be valuable and satisfactory." (Cooley's Const. Lim. \*66.)

Turning then to the proceedings of the convention, we find that section 9, when first reported from the committee having it under consideration, read as follows: " Appointments and promotions in the civil service of the State, and of cities, shall be made, so far as practicable, according to merit and fitness, to be ascertained by examination, which, so far as practicable, shall be competitive. Laws shall be made to provide for the enforcement of this section."

The gentleman having it more particularly in charge for the committee, Mr. Gilbert, in opening the debate upon the question of its adoption, after discussing the principle of appointments to, and promotions in, the civil service, upon merit to be ascertained by examination, said : " This principle as the Constitution now stands cannot be applied to public works and to State prisons. The Court of Appeals has so held in respect to one of those departments, and the principle which applies to one will apply with equal force to the other. So that the committee, and a very large number of petitioners of high character, \*  \*  \*  all concur in this, that we want

the principle incorporated into the Constitution, and we want to provide for its application in State prisons and in public works, as well as in other departments of the State." (Pp. 2438, 2439, Proc. of Con.)

And when the subject was again under discussion, the same gentleman said : " The Court of Appeals has held that appointments cannot be made in the prison service and in the public works service under the rules of the civil service. The case came up as to one of them, but the same reason that applied to that one obtains as to the others. So that I may say that under the law as it now stands, and under the Constitution as it now exists, the civil service rules cannot be applied to the prison service or to the public works service. I think that is reason enough for the passage of the main proposition." (Pp. 2552, 2553.)

Mr. Root said : " As the matter stands to-day, the court of last resort has ruled that the principle of civil service cannot be applied to the important positions in the State prisons and public works department, and the effect of this amendment will be to extend this reform to State prisons and canals." (P. 2559.)

Mr. Lauterbach said : " In behalf of regularity and order in the appointment of State prison officials and others, as to whom our attention was called during the process of the investigation by the charities committee, I think it would be a serious error on the part of this convention if, owing to any flippant spirit in which the matter has been considered, or on account of some local interest that might be prejudiced, we go to the people from this convention while our party has announced itself in favor of civil service reform, that in this convention, upon a trivial excuse that was presented, we voted it down." (P. 2561.)

Much discussion was had in the convention over the proposition to amend the section as presented to the convention, so as to extend its provisions to all the civil divisions of the State, " including cities and villages," and over that portion thereof which was finally adopted referring to honorably discharged soldiers and sailors; but nowhere do I find that any opposition was made to extending the operations of the civil service laws to the canal or public works department and the State prisons, or that any answer was made to the arguments of Mr. Gilbert or Mr. Root in favor of adopting the proposed sec-

tion in order that such departments might be subjected to the operations of the civil service laws.

After the convention had adopted the Constitution as a whole it adopted and issued an address to the people explaining its work and the various new provisions of the proposed Constitution.   Among other things, that address contained the following : " 10.  We have declared in the Constitution the principle of civil service reform, that appointments and promotions are to be based upon merit, and ascertained, so far as practicable, by competitive examination.   We sought by this to secure, not merely the advantage derived from declaring the principle, but the practical benefit of its extension to the State prisons, canals and other public works of the State, to which, under the existing Constitution, the court of last resort has decided that civil service rules cannot be applied."   (Proc. of Const. Con. p. 2683.)

I, therefore, take it that the convention had, as to such departments, " a common intent," and intended, by adopting the section in question, to bring the subordinates of the Superintendent of Public Works and of the Superintendent of State Prisons within the operation of the Civil Service Laws, and by the language used intended to, and supposed they had, modified the effect of the language used in sections 3 and 4 of article 5, in reference to appointments to be made by the Superintendents of Public Works and of State Prisons, and had nullified the effect of the decision in the case of *The People ex rel. Killeen v. Angle* (*supra.*)

It seems to me, therefore, that in reading section 3 of article 5 in connection with section 9 of that article, and considering the language used, the history and condition of the law as it was under the old Constitution, taken in connection with the proceedings in the constitutional convention, it was the plain intent of the framers of the Constitution, and of the people who adopted it, that all appointments in the civil service of the State should be made according to merit, to be ascertained, as far as practicable, by examination, and that they intended to extend that principle so as to include the subordinates and appointees of the Superintendents of Public Works and of State Prisons ; and that the power of appointment conferred upon the Superintendent of Public Works by section 3 was intended to be subject to the principles and limitations contained in section 9.

The relator contends, however, that section 9 is not self-executing, and that there has been no legislation to enforce it; that the section itself in terms recognizes the fact that legislation is needed to put it in force, by the clause, "laws shall be made to provide for the enforcement of this section," and that, until new laws are made to enforce its provisions, the section in question is of no force and effect, and that appointments are to be made as before its adoption.

The same contention was made in *The Matter of Sweeley* (12 Misc. Rep. 174; affd., 146 N. Y. 401), and it was there held that the pre-existing civil service laws were continued by the new Constitution, and that the then relator was subject to them. This case, perhaps, presents the matter in a little different aspect. There it was held that the law under which the then relator sought appointment had been abrogated by the new Constitution, and there being other laws upon the statute books not in conflict with the new Constitution, which were applicable to the relator's case, no new legislation was necessary.

It is said that such a construction renders unnecessary and meaningless the clause, "laws shall be made to provide for the enforcement of this section." I think that is a mistaken view, for full force and effect can be given to that clause without holding that it is necessary to re-enact all the civil service laws of the State. When we consider, as before stated, that the framers of the Constitution are presumed to have known the laws of the State, and if they did, also bear in mind that they must have known that the civil service laws did not extend to "all the civil divisions thereof, including cities and villages," and that to give full force and effect to that section of the Constitution additional laws would have to be passed extending and enlarging the operation of the existing civil service laws of the State.

But enough law is already in existence, to enforce the provisions of the Constitution as to the department of public works, to determine this case. As before stated, all parts of the Constitution are to be read together, and the sections under consideration must be read in connection with section 16 of article 1, which provides, amongst other things, as follows: "Such acts of the Legislature of this State as are now in force shall be and continue the law of this State, subject to such alterations as the Legislature shall make concerning the same. But all such parts of the common law, and such

of the said acts or parts thereof as are repugnant to this Constitution are hereby abrogated."

And, in construing the sections under consideration in connection with pre-existing laws, "we must keep in mind that the Constitution was not framed for a people entering into a political society for the first time, but for a community already organized and furnished with legal and political institutions, adapted to all or nearly all the purposes of civil government. And that it was not intended to abolish these institutions, except so far as they were repugnant to the Constitution then framed." (*People* v. *Draper*, 15 N. Y. 532.)

The members of the constitutional convention being assumed to have known the nature and effect of the then existing laws, and having provided for their continuance where in harmony with the new Constitution, we must also assume that they depended upon them, supplemented by such new legislation as should be necessary, to carry into effect the details of the Constitution.

The civil service laws of the State are in harmony with the present Constitution; they are, therefore, of the same force and effect as if they had been passed after the present Constitution took effect, and can be used, as far as they go, to enforce its provisions.

It is also claimed on behalf of the relator that, assuming that it was intended by section 9 of article 5 to bring the appointees of the Superintendent of Public Works within the provisions of the civil service laws and admitting that the civil service laws are continued in force, there is still necessity for legislation to bring such appointees within their provisions. To support this contention he relies upon that portion of section 9 in question, which says that the merit and fitness of appointees " shall be ascertained, so far as practicable, by examinations." And his contention is that it is necessary for the Legislature to determine whether it is practicable to ascertain the merit and fitness of appointees under the Superintendent of Public Works by examination, and that, until such determination is made, there is no means of enforcing as to that department the principles of section 9.

I do not think that this contention can prevail. While probably the Legislature has the power under this section to determine what officers and appointees in the civil service it is practicable to classify, and in what cases it is practicable to ascertain the fitness

and merits of candidates for positions by examination, still I do not think it is necessary for the Legislature to act in that respect in order to enforce the application of section 9 to the department of public works, because there was, when the Constitution was framed and adopted, a statute in existence which authorized and directed the Governor of the State to determine what subordinate places in the service of the State it was practicable to classify and subject candidates for to examination.

It has been said that a Constitution is " to be held as prepared and adopted in reference to existing statutory laws, upon the provisions of which in detail it must depend to be set in practical operation." (*People ex rel. Jackson* v. *Potter*, 47 N. Y. 375–380.)

The statutes in existence at the time when the present Constitution was adopted authorized the Governor to determine how far it was practicable to test the merit and fitness of candidates for subordinate places in the public service, by examination ; and the rule that holds that Constitutions are " prepared and adopted in reference to existing statutory laws," and in reliance upon their details to set them into practical operation, is much strengthened in this case by the similarity in meaning of the language used in the section of the Constitution under consideration, to that used in the Civil Service Law. Let us compare the language used in each. The Constitution provides that appointments and promotions in the civil service of the State, etc., " shall be made according to merit and fitness, to be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive."

The Civil Service Law (Chap. 354 of the Laws of 1883) makes it the duty of the Governor, with the aid of the Civil Service Commission, to prepare rules and regulations, which shall provide, amongst other things, " as nearly as the conditions of good administration will warrant, * * * for open, competitive examinations for testing the fitness of applicants for the public service, now classified, or to be classified, hereunder."

And again in section 6 of said act it is made the duty of the Governor to " cause to be arranged in classes of the several clerks and persons employed or being in the public service for the purposes of the examination herein provided for, and he shall include in one or more of such classes, so far as practicable, all

subordinate places, clerks and officers in the public service of the State."

Where the language used in the Constitution and in a previously existing statute is so nearly the same in meaning, it seems to me that we can well say that the framers of the Constitution had such statute in view, and relied upon it to enforce the provisions of that portion of the Constitution under consideration.

The Governor has acted under the power conferred upon him by the statute, and has determined that it is practicable to test the merit and fitness of candidates for positions in the department of public works by examination; for it appears in the papers before me on this application, that after the adoption of the Constitution, and on the 15th day of April, 1895, the Governor, with the aid of the Civil Service Commission, made a classification of the positions in the departments of public works and State prisons, and that under such classification the position of clerk to the collector of canal statistics was included in what is known as Schedule B, and that all appointments required to be made to the positions classified in Schedule B are to be made by selection from those persons graded highest as the result of open competitive examinations. And it also appears that at the time of the appointment of the relator to the position in question, there were eighty-eight persons upon what is known as the "eligible list" in Schedule B, who were eligible for appointment as clerks to the collectors of canal statistics.

It follows from what I have said that the Superintendent of Public Works should have made his appointments of clerks to the collectors of canal statistics from the eligible list just referred to; that the appointment of the relator was in violation of the Constitution and of the civil service laws of the State, and that his application for a mandamus must be denied.

Motion for a mandamus denied, not as a matter of discretion, but as a matter of law, without costs.