Howard A. MATTHEWS (substituted for Don M. Dafoe), Commissioner of Education; Alaska Board of Education; Fairbanks School District; Jack Gourley, Transportation Officer for the Fairbanks School District; and Edgar I. Baggen, in his capacity as President of the Board of Directors of the Fairbanks School District, Appellants,

v.

Judy Kay QUINTON, by next of friend, Lawrence R. Quinton and Loyola I. Quinton, on behalf of herself and all other children similarly situated; Lawrence R. Quinton and Loyola I. Quinton, on behalf of themselves and others similarly situated, Appellees.

No. 48.

Supreme Court of Alaska.

April 3, 1961.

Rehearing Denied June 29, 1961.

Ralph E. Moody, Atty. Gen., and Norman L. Schwalb, Asst. Atty. Gen., for appellants.

Edward A. Merdes, McNealy, Merdes & Camarot, Fairbanks, for appellees.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

This is a class action by a school child, Judy Kay Quinton, who, with her parents, sought to enjoin the defendant school authorities from refusing to transport her on a public school bus to the nonpublic school which she was attending. From a summary judgment in favor of Judy and all children of the plaintiff class similarly situated, the defendants have appealed.[1]

With some modifications we shall adopt the statement of facts from a written opinion rendered by the lower court at the time of filing the summary judgment.

The amended complaint in this case was filed on February 21, 1959. At that time the plaintiff Judy was eleven years of age and attending the fourth grade in Immacu-late Conception Elementary School, a nonpublic school in Fairbanks and within the Fairbanks School District which is an incorporated independent school district. Under the laws of Alaska all children between seven and sixteen years of age, or until they have completed the eighth grade, are required to attend school. Attendance may be at either a public or private school and it is not compulsory if the child resides more than two miles from a school, unless transportation is furnished.[2] The law also empowers the defendant Alaska Board of Education, among other things, to require school districts to enter into contracts with the Board for the operation, or sub-contracting of the operation, of transportation systems for pupils to and from the schools within their respective service areas.[3] Acting for the Board of Education, the Commissioner of Education entered into a contract with the Fairbanks School District for the transportation of pupils residing more than one and one-half miles from the school they were required to attend.

Judy resided more than one and one-half miles from Immaculate Conception School, but there was a public elementary school, with classes up through the sixth grade, less than one and one-half miles from her home. The Fairbanks School District operated a school bus which went by Judy's home and transported children to the public junior and senior high schools in Fairbanks. As this bus went near by Immaculate Conception School, Judy used it for transportation to her school until January 28, 1959, when defendant Jack Gourley, transportation officer for the Fairbanks School District, issued a directive that resulted in this law suit. Under the directive, effective immediately, all public school buses were to

1. This judgment permanently enjoined the defendant Commissioner of Education and the Alaska Board of Education from (1) withholding school bus transportation to the plaintiff class on the basis of their proximity to a public school which they do not attend; (2) applying any other distance test than that of the distance from place of residence to the school of actual attendance for the pur-

pose of determining rights to school bus transportation; and (3) refusing to stop and discharge children attending nonpublic schools at a point along the route nearest to such schools.

2. Section 37-7-1, ACLA 1949.

3. Section 37-2-8, ACLA 1949, as amended, SLA 1957, Ch. 51 (§ 37-2-8, ACLA Cum.Supp.1957).

discontinue picking up elementary school children living closer than one and one-half miles from a public school and were not to discharge passengers at nonpublic schools en route but were to do such discharging only upon arrival at a public elementary school.

As in the lower court, the controversy here turns upon the effect and constitutionality of an Alaska statute passed by the Territorial legislature in 1955 which relates to the free transportation of children attending nonpublic schools in Alaska. SLA 1955, Ch. 39 (§§ 37–11–4 to 37–6, ACLA Cum.Supp.1957). The statute in question is set out in the margin and will be referred to hereinafter as Chapter 39.[4] One reading the statute must bear in mind that, at the time of its enactment, Alaska was still a Territory and had for its constitution the Organic Act of Alaska.[5] Section 9 of this Act prohibited the appropriation of public funds for nonpublic school purposes in the following language:

"* * * nor shall any public money be appropriated by the Territory or any municipal corporation therein for the support or benefit of any sectarian, denominational or private school, or any school not under the exclusive control of the government; * * * and

all laws passed, or attempted to be passed, by such legislature in said Territory inconsistent with the provisions of this section * * * shall be null and void."[6]

The trial court in its opinion seriously questioned the validity of Chapter 39 in the light of the provision of Section 9 of the Organic Act just quoted, but concluded that such provision yielded to the force and language of the Alaska state constitution subsequently ratified and adopted. We shall have more to say about the pertinent provisions of the constitution further along in this opinion.

■ The appellants take the position that Chapter 39 does not violate the provisions of the Organic Act if it is given the interpretation to which they claim it is entitled. They argue that Chapter 39, with respect to the transportation of nonpublic school children by public school buses, merely states and means that, if such children live more than a prescribed distance from a public school which they could attend, then they are entitled to ride the public school bus to the nonpublic school which they are actually attending, the other requirements of the statute as to "comparable distances" and "same routes" hav-

---

4. Chapter 39, SLA 1955: "Section 1. The Legislature recognizes these facts:

"(a) Attendance at schools for all children between the ages of seven and sixteen years is compulsory, except in those cases where a child, residing more than two miles from his school, is not furnished with transportation.

"(b) The health of all children is endangered by requiring them to walk long distances to school in inclement weather; and their safety, also, is endangered in requiring them to so walk to their schools along highways that have no sidewalks.

"Therefore, in order to protect the health and safety of all school children in Alaska, and to achieve the objectives of the compulsory education laws of Alaska, this statute is enacted.

"Section 2. In those places in Alaska where transportation is provided under Section 37–2–8 ACLA 1949 for children attending public schools, transportation shall likewise be provided for children who, in compliance with the compulsory education laws of Alaska, attend nonpublic schools which are administered in compliance with Sections 37–11–1, 37–11–2 and 37–11–3 ACLA 1949, where such children, in order to reach such non-public schools, must travel distances comparable with, and over routes the same as, the distances and routes over which the children attending public schools are transported.

"Section 3. This Act shall be administered by the Commissioner of Education under the direction and supervision of the Territorial Board of Education, and the total cost of all such transporation shall be paid from funds appropriated for that purpose by the Legislature."

5. 37 Stat. 512, 48 U.S.C.A. § 21 et seq.

6. 37 Stat. 514, 48 U.S.C.A. § 77.

ing been met.[7] In other words, the appellants are asking us to construe the words "his school" in Section 1(a) of the statute to mean "a public school." On this issue the lower court ruled that in order for Chapter 39 to make sense, the crucial distance is not the distance to the nearest public school or the distance to some other nonpublic school but the distance which the child must travel in order to reach the nonpublic school which he is attending. With that ruling we are in accord.

Having thus ruled on the construction to be given to Chapter 39, we need to determine next whether it was a valid enactment under the restrictive provisions of Section 9 of the Organic Act. The question of whether statutes providing for the transportation of children to nonpublic schools at public expense are in contravention of a constitutional prohibition against the appropriation of public funds or public school funds for the support or benefit of sectarian or private (nonpublic) schools has been before the courts of the land on a number of occasions. One line of authority holds that such statutes are violative of the constitutional provision mentioned.[8] The reasoning employed in support of this position is perhaps best stated in the New York case of Judd v. Board of Education [9] wherein the court said:

"* * * Free transportation of pupils induces attendance at the school. The purpose of the transportation is to promote the interests of the private school or religious or sectarian institu-

tion that controls and directs it. 'It helps build up, strengthen and make successful the schools as organizations.' State ex rel. Traub v. Brown * * *. Without pupils there could be no school. It is illogical to say that the furnishing of transportation is not an aid to the institution while the employment of teachers and furnishing of books, accommodations and other facilities are such an aid. * * * "

Then there is another line of authority which holds that a statute such as Chapter 39 is for the benefit of the pupils of the school and that it does not contravene constitutional provisions prohibiting the use of public funds for the benefit of a nonpublic school.[10] The rationale of the two courts which support this latter view is set forth by the District Court of Appeals for the Fourth District of California in Bowker v. Baker,[11] as follows:

"The general line of reasoning running through those cases which uphold the right of the school district to provide free transportation for [nonpublic] school children finds its starting point in the undoubted police power of the state to promote the public welfare by aiding in practical ways the education of the young. It is generally held that the direct benefit conferred is to the children with only an incidental and immaterial benefit to the private schools; that this indirect benefit is not an appropriation of public money for private purposes and does not violate

7. See note 4 supra.

8. State ex rel. Van Straten v. Milquet, 1923, 180 Wis. 109, 192 N.W. 392; State ex rel. Traub v. Brown, 1934, 6 W.W. Harr. 181, 36 Del. 181, 172 A. 835, writ of error dismissed 1938, 9 W.W.Harr. 187, 39 Del. 187, 197 A. 478; Judd v. Board of Education, 1938, 278 N.Y. 200, 15 N.E.2d 576, 118 A.L.R. 789, reargument denied 1938, 278 N.Y. 712, 17 N.E. 2d 134; Gurney v. Ferguson, 1941, 190 Okl. 254, 122 P.2d 1002; Sherrard v. Jefferson County Board of Education, 1942, 294 Ky. 469, 171 S.W.2d 963; Mitchell v. Consol. School Dist. No. 201, 1943, 17 Wash.2d 61, 135 P.2d 79, 146

A.L.R. 612; Visser v. Nooksack Valley School Dist. No. 506, 1949, 33 Wash.2d 699, 207 P.2d 198; McVey v. Hawkins, 1953, 364 Mo. 44, 258 S.W.2d 927.

9. 1938, 278 N.Y. 200, 15 N.E.2d 576, 582, 118 A.L.R. 789.

10. Board of Education of Baltimore County v. Wheat, 1938, 174 Md. 314, 199 A. 628; Adams v. County Commissioners of St. Mary's County, 1942, 180 Md. 550, 26 A.2d 377; Bowker v. Baker, 1946, 73 Cal.App.2d 653, 167 P.2d 256.

11. 1946, 73 Cal.App.2d 653, 167 P.2d 256, 260.

any constitutional provision against giving State aid to denominational schools."

Since the question raised here is one of first impression in Alaska, we have also read and carefully considered the decisions of the courts of Connecticut, Kentucky, Massachusetts and New Jersey, which, at first blush, might seem to follow the Maryland and California rule. We find, however, that those courts did not squarely face the issue before us here.

In Snyder v. Town of Newtown, 1960, 147 Conn. 374, 161 A.2d 770, appeal dismissed 81 S.Ct. 692, 5 L.Ed.2d 688, it was held that school funds could be used only for the support of public or common schools. It was also held that a Connecticut statute permitting municipalities to vote whether they should pay from their general funds for the transportation of children to nonpublic schools did not violate a constitutional provision, C.G.S.A.Const. art. 7, § 1, that " * * * no person shall by law be compelled to join or support * * * any congregation, church or religious association." [12]

In Sherrard v. Jefferson County Board of Education,[13] the Kentucky Court of Appeals had held that public school funds could not be used for the transportation of children attending private schools. Three years later, in Nichols v. Henry, 1945, 301 Ky. 434, 191 S.W.2d 930, 168 A.L.R. 1385, the same court, though reaffirming its decision in the Sherrard case, held that the individual counties could pay for such transportation out of their general funds, but not out of any funds or taxes raised or levied for educational purposes.

The Supreme Judicial Court of Massachusetts in Quinn v. School Committee of Plymouth, 1955, 332 Mass. 410, 125 N.E.2d 410 held that mandamus would lie to compel a town school committee to provide transportation for pupils attending private elementary schools to the same extent that the committee provided transportation for public elementary school pupils. The court avoided the constitutional question by holding that, since no personal or property rights of the committee were involved, that body could not question the constitutionality of the statute which provided for such transportation.

The New Jersey Court of Errors and Appeals, in Everson v. Board of Education of Ewing Tp.,[14] on the rule of presumption sustained the constitutionality of state legislation which authorized the local school districts to make rules and contracts for the transportation of children to and from school and also held valid the resolution under which the appellee, a township board of education, authorized reimbursement to parents of money expended by them for transportation of their children to Catholic parochial schools. Since it was not shown, one way or the other, that any of the funds involved came from [133 N.J.L. 350, 44 A.2d 336] "the fund for the support of free schools" the court presumed that the payment was made out of money constitutionally available for that purpose. It is obvious that the court would have decided otherwise if any showing had been made that the funds had been mingled as argued by the dissenting opinion.[15] Be that as it may, New Jersey amended its constitution two years later to permit such transportation.[16]

The Everson case eventually reached the Supreme Court of the United States,[17] which by an unpersuasive five to four deci-

---

12. 161 A.2d at page 775 note 2.

13. 1942, 294 Ky. 469, 171 S.W.2d 963.

14. 1945, 133 N.J.L. 350, 44 A.2d 333, reversing a judgment of the New Jersey Supreme Court in favor of the taxpayer, Everson, who had challenged the right of the Board to reimburse parents of parochial school children for bus fares paid in connection with school transportation. The latter case is reported as Everson v. Board of Education of Ewing Tp., 1944, 132 N.J.L. 98, 39 A.2d 75.

15. 44 A.2d at pages 340–341.

16. See note 45 infra.

17. Everson v. Board of Education, 1947, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, 168 A.L.R. 1392.

sion upheld the New Jersey statute mentioned above. The majority of the Court accepted the finding of the New Jersey Court of Errors and Appeals as being "that neither the [New Jersey] statute nor the resolution [of the school board] passed pursuant to it was in conflict with the State constitution or the provisions of the Federal Constitution in issue."[18] Actually, as we view it, the New Jersey court held that only general state funds and general funds of the school districts could be constitutionally used to pay the costs of transportation to nonpublic schools. But "the fund for the support of free schools" could not be so used. Historically such special school funds were set aside and used entirely for the support of the free schools. The early state constitutions were worded with the thought in mind that the only money available to the schools would come from that fund and would be limited to the support of public free schools. The income from such funds has been found inadequate to supply the money needed for schools in this modern age however, and so recourse is also had to the general funds.[19] The New Jersey court concluded that the state constitution did not prohibit the use of "general funds" to pay for transportation to nonpublic schools. The Alaska Organic Act made no such distinction between "general funds" and "funds for the support of free schools." Its proscription was against the appropriation of "any public money."[20]

In the final analysis, the Supreme Court in the Everson case did nothing more than accept the state court's interpretation of the New Jersey constitution and then hold that the use of the state's general fund to pay for the transportation in question was not a violation of the First and Fourteenth Amendments of the federal constitution.[21]

Having carefully examined Chapter 39 and that provision of Section 9 of the Alaska Organic Act which proscribed the appropriation of public funds for the support or benefit of any sectarian, denominational or private school, and having weighed the decisions from other jurisdictions for and against the right of a state to provide for the free transportation of children to nonpublic schools, and being mindful of the due regard which should be had for a judicial determination of the United States Supreme Court on a related matter, we hold that Chapter 39 violated the plain provisions of the Organic Act above mentioned.

In its public schools Alaska has long provided for the secular education of all children, but it does not prevent any child from obtaining secular or both secular and sectarian education in nonpublic schools, provided only that these schools meet the secular standards prescribed.[22] If those standards are met, the parent or guardian has a constitutional right to send the child to a nonpublic school.[23] The exercise of this right by the individual is not inconsistent with our determination that the legislature of the Territory of Alaska under the provisions of Section 9 of the Organic Act had no authority to pass a statute which required the use of public

18. Id., 330 U.S. at page 4, 67 S.Ct. at page 505, 91 L.Ed. at page 717, 168 A.L.R. at page 1398.

19. Everson v. Board of Education of Ewing Tp., 1945, 133 N.J.L. 350, 44 A.2d 333, 336; see also Visser v. Nooksack Valley School Dist. No. 506, 1949, 33 Wash.2d 699, 207 P.2d 198, 202.

20. The same holds true under the provisions of article VII, section 1, and article IX, section 6 of the Alaska state constitution.

21. The majority opinion was written by Justice Black, with Chief Justice Vinson and Justices Murphy, Reed and Douglas concurring. Justices Jackson, Rutledge, Frankfurter and Burton dissented.

22. These standards are set forth in sections 37–11–1 to 37–11–3, ACLA 1949 and pertain to teachers' certificates, final eighth grade examinations and diplomas, and attendance and annual reports.

23. Pierce v. Society of Sisters, 1925, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468.

funds to pay for the transportation of children to a nonpublic school; because such use of the public funds, we hold, constitutes a benefit to the nonpublic school. Nor is such legislation a valid exercise of the police power, as we shall later point out.

At this point the appellees, Judy Quinton and her parents, interpose the argument that, even if Chapter 39 violated the provisions of the Organic Act here under consideration, no court ever passed upon the question of its constitutionality during Alaska's territorial status. Hence, the statute was in full force and effect when the Alaska state constitution became operative on January 3, 1959,[24] and was ratified and confirmed by article XV, section 1 of the constitution which provides:

> "All laws in force in the Territory of Alaska on the effective date of this constitution and consistent therewith shall continue in full force until they expire by their own limitation, are amended, or repealed."[25]

We cannot accept the argument as a sound one. The dictionary[26] gives the word "valid" as one of the definitions of the phrase "in force." Professor Willoughby in his work on constitutional law stated some thirty years ago that the validity of a statute is to be tested by the constitutional powers of a legislature at the time of its enactment and, if so tested, it is beyond the legislative power, it will not be rendered valid by a constitutional amendment, except by subsequent re-enactment.[27]

We consider the finding of the Washington State supreme court on a similar question in State v. Ellis, 1900, 22 Wash. 129, 60 P. 136, to be applicable here. In 1854 the legislature of the Territory of Washington passed a law providing that a defendant in a criminal case and the prosecuting attorney, with the assent of the court, might submit the trial to the court except in capital cases. Ellis was charged with robbery and stipulated that he should be tried by eleven jurors. The jury found him guilty and Ellis moved to set aside the verdict as void and for a new trial. The lower court granted the motion for the reason that Ellis could not waive the constitutional right to a trial by twelve jurors. The state appealed from the motion, contending that inasmuch as the law was upon the statute books at the time of the adoption of the Washington state constitution (1889), and section 2 of article 27 of the constitution provided that the laws which were then in force in the Territory of Washington and not repugnant to the constitution should remain in full force until they expired by their own limitation or were repealed by the legislature, this law became incorporated into the laws of the state and had to be considered as valid existing constitutional law until declared to be unconstitutional by competent judicial authority. To this claim of the state, the appellate court replied:

> "But we hardly think this rule of construction is sound. Section 2 of article 27 could not be construed as re-enacting a statute, as all the force it had was to continue in force all valid laws which were then in existence."[28]

■■ We recognize the legal principle that a constitutional provision, which from the language used shows expressly or by

---

24. The present action was not commenced until January 30, 1959, twenty-seven days after the effective date of the state constitution.

25. This argument may have stemmed from the opinion of the lower court in which it was stated that "the efficacy of this clause of the Organic Act obviously yielded to the force and language of the Alaska Constitution from and after January 3, 1959, in particular Article VII, Section 1 thereof."

26. Webster, New International Dictionary, Unabridged (2d ed. 1960).

27. 1 Willoughby, Constitutional Law of the United States § 7, at 11 (2d ed. 1929).

28. 60 P. at page 137.

necessary implication that it was intended to operate retrospectively to validate antecedent unconstitutional legislation, renders valid all such legislation to which the constitutional provision relates, without re-enactment by the legislature, unless such attempted validation would impair the obligations of a contract or divest vested rights.[29] The cases we have examined, bearing on the subject, require that the validating constitutional provision must make some reference, however slight or inferential, to the statute intended to be validated.[30] Tested by the principles just stated, section 1 of article XV of the Alaska constitution, in our opinion, does not show by the language used, either directly or by necessary implication, that it was intended to operate retrospectively so as to validate Chapter 39. It follows, therefore, that Chapter 39 remains as void today as it was on the day of its enactment.

We next address ourselves to the question of whether under section 1 of article VII and section 6 of article IX of the state constitution, Chapter 39 may now be validated through its re-enactment by the state legislature. We believe not.

Section 6 of article IX of our constitution specifically declares that

"No tax shall be levied, or appropriation of public money made, or public property transferred, nor shall the public credit be used, except for a public purpose."

This is a general measure and expresses a very definite policy. It needs to be considered, however, in relation to section 1 of article VII which provides that

"The legislature shall by general law establish and maintain a system of public schools open to all children of the State and may provide for oth-

er public educational institutions. Schools * * * so established shall be free from sectarian control. No money shall be paid from public funds for the direct benefit of any religious or other private educational institution."

Appellees concede that there is conflict in the judicial philosophies relative to statutes of such kind as Chapter 39 but maintain that the view favoring their constitutionality is the more persuasive, reflects the current judicial trend and is called for by the decision of the United States Supreme Court in the Everson case. We disagree except as to the statement that there is a conflict in the judicial philosophies.

The key words in section 6 of article IX and section 1 of article VII of the Alaska constitution, insofar as this case is concerned, are "for a public purpose" and "direct benefit." Appellees contend that Chapter 39 serves a very valuable public purpose by encouraging compliance with the state's compulsory education law and contributes to the health and welfare by eliminating the hazards of highway and climatic conditions in Alaska for nonpublic school children. It is their further contention that Chapter 39 is designed to aid the parents and their children. In this connection they cite the cases from other jurisdictions which hold that the transportation of school children to nonpublic schools is for the benefit of the children and confers no direct benefit upon the schools concerned.

It is true that the legislature in enacting Chapter 39 recognized the following facts as stated in the statute itself:

"(a) Attendance at schools for all children between the ages of seven

29. Annotation, 1947, 171 A.L.R. 1072–1079, in which the rule is stated and many cases in relation thereto are cited and discussed.

30. People ex rel. McClelland v. Roberts, 1896, 148 N.Y. 360, 42 N.E. 1082, 31 L.R.A. 399; Fontenot v. Young, 1911, 128 La. 20, 54 So. 408; Peck v. Tug-well, 1941, 199 La. 125, 5 So.2d 524; Lee v. Superior Court, 1923, 191 Cal. 46, 214 P. 972; Boyd v. Olcott, 1921, 102 Or. 327, 202 P. 431, 448; Northern Wasco County People's Utility District v. Wasco County, 1956, 210 Or. 1, 305 P. 2d 766, 771; Porto Rico Brokerage Co. v. United States, 1934, 71 F.2d 469, 23 CCPA 236.

and sixteen years is compulsory, except in those cases where a child, residing more than two miles from his school, is not furnished with transportation.

"(b) The health of all children is endangered by requiring them to walk long distances to school in inclement weather; and their safety, also, is endangered in requiring them to so walk to their schools along highways that have no sidewalks.

"Therefore, in order to protect the health and safety of all school children in Alaska, and to achieve the objectives of the compulsory education laws of Alaska, this statute is enacted."

But this intent of the legislature to protect the health and safety of all school children in Alaska was not carried out in the statute enacted. The only nonpublic school children entitled to free transportation under Chapter 39 are those who must travel comparable distances and the same routes over which the children attending public schools are transported. In other words, nonpublic school children who are fortunate enough to be living along a public school bus route are given transportation. All other nonpublic school children living within the two mile compulsory attendance limit and more than one and one-half miles from their school are left to fend for themselves.

It cannot be truthfully said that the severe winter weather and the highways without sidewalks around Fairbanks are less hazardous to the health, welfare and safety of the nonpublic school child who does not live along a school bus route and therefore has to walk to school than to

the health, welfare and safety of his classmate who rides because his home is along the route. Nor can anyone say that the public school first grader, who lives 1.49 miles from his school and has to walk, will feel the cold less than, and not have to face the same traffic risks as, an older sixth grader of the nonpublic school who gets to ride on the public school bus because he lives along the bus route and at a distance of 1.51 miles from the nonpublic school of his choice.

Neither the inclement weather nor highway traffic hazards were used as a justification for the first law passed in Alaska to provide transportation for school children. We refer to section 83 of chapter 97 of the Laws of Alaska, 1929, which simply stated that school boards were authorized to contract for the transportation of pupils "who reside a distance of more than two (2) miles from the school they are required to attend, or where such transportation is necessary to afford children an opportunity to attend school." Distance from school seems to have been the motivating force for legislation at that time.

By what has just been said we do not mean to imply that the legislature has no authority to provide by legislation for the health and safety of all school children in Alaska. Nor do we mean to decide that Chapter 39 is discriminatory in its nature. All we are saying at this time is that Chapter 39 does not effectuate the intent expressed therein by the legislature.

■ Turning now to the argument that the transportation of school children to nonpublic schools on public school buses is of direct benefit only to the child,[31] we

31. The "child benefit theory" seems to have been first advanced in support of a Louisiana statute providing for the appropriation of public funds for the purchase of school books for nonpublic school children. In Borden v. Louisiana State Board of Education, 1929, 168 La. 1005, 123 So. 655, 663, 67 A.L.R. 1183, the Louisiana supreme court held that such appropriation was for the benefit of the children and the resulting benefit of the state. Three of seven members of the court took the view that the statute was unconstitutional, stating that "the maintenance of private or sectarian schools, however valuable may be the work which they perform, is not a public purpose so as to justify the expenditure of the public money in their support."

say again that, in our opinion, the furnishing of such transportation at public expense constitutes a direct benefit to the school. This was the view expressed by the courts of Delaware, New York, Oklahoma, Washington, and Kentucky,[32] and it was also the view favored by the dissenting jurists in Maryland,[33] Louisiana (in a textbook case),[34] and New Jersey,[35] where the state courts have adopted the child benefit theory, and by the four dissenting Justices of the United States Supreme Court in Everson v. Board of Education.[36] Said Mr. Justice Rutledge in the Everson case:

"Finally, transportation, where it is needed, is as essential to education as any other element. Its cost is as much a part of the total expense, except at times in amount, as the cost of textbooks, of school lunches, of athletic equipment, of writing and other materials; indeed of all other items composing the total burden. Now as always the core of the educational process is the teacher-pupil relationship. Without this the richest equipment and facilities would go for naught. See Judd v. Board of Education, 278 N.Y. 200, 212, 15 N.E.2d 576, 118 A.L.R. 789. But the proverbial Mark Hopkins conception no longer suffices for the country's requirements. Without buildings, without equipment, without library, textbooks and other materials, and without transportation to bring teacher and pupil together in such an effective teaching environment, there can be not even the skeleton of what our times require. Hardly can it be maintained that transportation is the least essential of these items, or that it does not in fact aid, encourage, sustain and support, just as they do, the very process which is its purpose to accomplish. No less essential is it, or the payment of its cost, than the very teaching in the classroom or payment of the teacher's sustenance. Many types of equipment, now considered essential, better could be done without.

"For me, therefore, the feat is impossible to select so indispensable an item from the composite of total costs, and characterize it as not aiding, contributing to, promoting or sustaining the propagation of beliefs which it is the very end of all to bring about. Unless this can be maintained, and the Court does not maintain it, the aid thus given is outlawed. Payment of transportation is no more, nor is it any the less essential to education, whether religious or secular, than payment for tuitions, for teachers' salaries, for buildings, equipment and necessary materials. Nor is it any the less directly related, in a school giving religious instruction, to the primary religious objective all those essential items of cost are intended to achieve. No rational line can be drawn between payment for such larger, but not more necessary, items and payment for transportation. The only line that can be so drawn is one between more dollars and less. Certainly in this realm such a line can be no valid constitutional measure. * * * "[37]

32. The cases in which the states listed in the text rejected the child benefit theory are cited in note 8 supra.

33. Board of Education of Baltimore County v. Wheat, 1938, 174 Md. 314, 199 A. 628, 633–642.

34. Borden v. Louisiana State Board of Education, 1938, 168 La. 1005, 123 So. 655, 662–664, 67 A.L.R. 1183.

35. Everson v. Board of Education of Ewing Tp., 1945, 133 N.J.L. 350, 44 A.2d 333, 338–343.

36. Everson v. Board of Education, 1947, 330 U.S. 1, 47–49, 67 S.Ct. 504, 527, 91 L.Ed. 711, 740.

37. Judge Case of the New Jersey Court of Errors and Appeals, who wrote the dissenting opinion in the Everson case when it was being considered in the state court, pointed out that among the weak-

About two years after the United States Supreme Court had handed down its opinion in the Everson case,[38] the supreme court of the state of Washington decided in Visser v. Nooksack Valley School District No. 506,[39] that the payment of transportation to parochial schools violated the state constitution. The court did not feel itself bound by the decision in the Everson case and in that respect stated:

"Our own state constitution provides that no public money or property shall be used in support of institutions wherein the tenets of a particular religion are taught. Although the decisions of the United States supreme court are entitled to the highest consideration as they bear on related questions before this court, we must, in light of the clear provisions of our state constitution and our decisions thereunder, respectfully disagree with those portions of the Everson majority opinion which might be construed, in the abstract, as stating that transportation, furnished at public expense, to children attending religious schools, is not in support of such schools. While the degree of support necessary to constitute an establishment of religion under the First Amendment to the Federal constitution is foreclosed from consideration by reason of the decision in the Everson case, supra, we are constrained to hold that the Washington constitution although based upon the same precepts, is a clear denial of the rights herein asserted by appellants."

The most recent appellate court case, which we have found, that strikes down transportation of nonpublic school children on public school buses is that of McVey v. Hawkins, 1953, 364 Mo. 44, 258 S.W. 2d 927. Here the Missouri supreme court, sitting en banc, delivered a per curiam opinion that transportation of parochial school pupils on public school buses was an expenditure of public school funds for other purposes than the support and maintenance of free public schools as directed by the constitutional and statutory provisions of the state, notwithstanding the claim that the buses furnishing such transportation did not travel any greater distance or by any different route or make any special stops and that, consequently, no additional expense or outlay of any kind was incurred by the furnishing of such transportation. Without mentioning the Everson case, the court expressly rejected the "child-benefit theory."

In spite of appellees' contention that the Everson case is controlling in the case

---

nesses in the "child benefit" argument, as a means of avoiding constitutional limitations, "are its vagueness and the impossibility of satisfactorily distinguishing one item of expenses from another in the long process of child education." [133 N.J.L. 350, 44 A.2d 339] He continued:

"We quickly perceive that it [the "child benefit" argument] applies not merely to transportation costs but to the potential costs of the many and varied items entering into modern education. There is no logical stopping point. Related items, already in the public school system, in addition to the vast field having to do with the actual imparting of knowledge, are the installation and maintenance of cafeterias, the preservation and promotion of the health of pupils, the employment of medical inspectors and nurses, the keeping of records of development and growth, and the supervision of athletic activities and bodily exercise. I am unable to distinguish between the logic of using public funds for one as against another of the several parts of the system pursued by the public schools toward 'the advancement of education, the promotion of literacy and the health and safety' of the pupils. Every step in the educational process is, presumably, for the benefit of the child and, therefore, theoretically for the benefit of the state. Consequently, if the argument is sound, it is within the discretion of the legislature, free of constitutional restraint, to provide for practically the entire cost of education in private and parochial as well as in public schools."

38. Page 936, supra.

39. 1949, 33 Wash.2d 699, 207 P.2d 198, 204.

at bar and contrary to the opinion of the District Court for the District of Alaska that it felt itself bound by the holding in the Everson case,[40] we propose to follow the reasoning of the Courts of Washington, Missouri, Delaware, Wisconsin and Oklahoma and hold that transportation of school children to nonpublic schools at public expense would be in contravention of our state constitution.

There remains for consideration the claim of the appellees that the minutes of the Alaska constitutional convention make it unmistakably clear that, in refusing to add the term "indirect" as an amendment to article VII, section 1, of the constitution, the delegates explicitly intended to continue and not to eliminate bus transportation for nonpublic school children. The minutes of the convention [41] do reveal that the Committee on Health, Education and Welfare Provisions in drafting the last sentence of article VII, section 1, which provides that "No money shall be paid from public funds for the direct benefit of any religious or other private educational institution," considered the words "direct" and "indirect" and felt that the

words "or indirect" after the word "direct" should not be used for the reason that "they would reach out to infinity practically" and shut out the children in private schools from such free care as was being given by the state welfare department to all children.[42]

Several delegates to the constitutional convention in the floor debate on the issue of whether section 1 of article VII should be amended to include the words "or indirect," mentioned transportation but only one of them, Mr. Buckalew, expressed an opinion in the matter, stating

"Mr. President, I don't think the question has been answered yet by any of the persons who have spoken on this subject. If the word 'indirect' is in there, it is going to eliminate almost any kind of aid. It will, for example, eliminate the free lunch, eliminate bus transportation, eliminate for example, if we had a school or an institution where they had a school, it would eliminate the State giving any support to the child because that would be indirect support to the institution. I think when the members

40. The Honorable Vernon D. Forbes who wrote the opinion below, upon which the judgment was based, frankly admitted that if he had not felt himself bound by the holding in the Everson case, he would have adopted the reasoning and decision of the dissenting Justices and ruled otherwise. It was his feeling that the wall of separation between church and state in this country had been weakened by Everson.

41. All references in this opinion to the minutes and proceedings of the Alaska constitutional convention are to the Records of Alaska Constitutional Convention, now in the custody of the Secretary of State, Juneau, Alaska.

42. Roland Armstrong, a member of the Committee on Health, Education and Welfare Provisions, spoke for the Committee and explained to the convention the reasons for the Committee's action in using the word "direct" as follows:
"* * * This section gives the education or other departments the right to seek out the children, independent of their religious affiliations, to help them

to become a strong and useful part of society wherever it touches health and matters of welfare. We would also point out in the light of letters that have come to this floor relative to the disbursement of funds, denominational or other private institutions, this does not prohibit the use of funds in other educational matters, and I am sure that no one on the committee would object to the inclusion of this word as we have given the amendment here to clarify this one statement. Now it reads as has been amended by the Committee, 'No money shall be paid from public funds for the direct benefit of any religious or other private educational institution.' We did this to take any doubt away on the part of this Convention of our motives, and we state that where there are welfare cases for children in homes and when there are indigents in hospitals that we do not wish to interfere with that practice of helping to serve people through those institutions * * *." Alaska Constitutional Convention Minutes, January 9, 1956, pp. 55–56.

vote on it, I think they ought to understand the word "indirect" cuts out everything, just eliminates all kinds of support."[43]

From such a state of the record the appellees would have us infer that the minutes of the constitutional convention make it unmistakably clear that the delegates intended not to eliminate free transportation for nonpublic school children. We find no such clear meaning expressed in those minutes as would give us any reliable assistance in interpretation. As Professor Willoughby once observed, "Every member of such a convention acts upon such motives and reasons as influence him personally, and the motions and debates do not necessarily indicate the purpose of a majority of a convention in adopting a particular clause."[44] We feel that the delegates to the Alaska constitutional convention and the people who by their vote ratified the constitution left it to this court to decide whether free transportation of children to nonpublic schools would constitute a "direct" benefit to the schools. If they had intended otherwise, we are certain that the framers of our constitution would have followed the example set by the people of New York and New Jersey and settled the controversial issue by providing in the constitution itself for transportation of school children to nonpublic schools at state expense.[45]

■■■ Earlier in this opinion we stated that we did not consider Chapter 39 a valid exercise of the police power of the state.[46] That point needs to be clarified. It has been said that the police power—broad and comprehensive though it is—may not be exercised in contravention of plain and unambiguous constitutional inhibitions.[47] In Board of Education of Baltimore County v. Wheat,[48] Judge Parke, dissenting, conceded that the sovereign state has inherent and reserved police power to enact laws to promote the safety, health and general welfare of society but stated that this power must be exercised within constitutional limits. It was his opinion, and that of the other two judges who concurred in the dissent, that the extension of the exercise of the police power to the transportation of school children, because of the dangers of pedestrian travel by children upon the public highway, would be of doubtful legality even if it were an effort of the state to protect, without discrimination, all school children.

The summary judgment is reversed with directions to dismiss the action.

NESBETT, C. J., concurs.

DIMOND, Justice (dissenting).

I dissent from the majority's harsh and unjust conclusion. In reviving the lifeless corpse of the Alaska Organic Act, the court ignores realities and establishes a harmful rule of constitutional interpretation. In concluding that the transportation of a child directly benefits a school, it disregards facts inescapable on the record of the Constitutional Convention, and assumes a state of facts that the record does

43. Id. at 69.

44. 1 Willoughby, Constitutional Law of the United States § 32 (2d ed. 1929).

45. New York amended article 11, section 4, of its constitution in 1938, after the decision in the Judd case (see note 8 and page 935, supra), to permit the legislature to provide for the expenditure of public funds for the transportation of children to and from any school. Board of Education of Central School District No. 1, etc., v. Allen, 1959, 17 Misc.2d 1080, 192 N.Y.S.2d 186. New Jersey, on the other hand, adopted an entirely new

constitution in 1947 and provided as a part of article VIII, section 4, paragraph 3, thereof that "The Legislature may, within reasonable limitations as to distance to be prescribed, provide for the transportation of children within the ages of five (5) and eighteen (18) years inclusive, to and from any school."

46. Pages 937 and 938, supra.

47. Mitchell v. Consolidated School Dist. No. 201, 1943, 17 Wash.2d 61, 135 P. 2d 79, 146 A.L.R. 612, citing authorities.

48. 1938, 174 Md. 314, 199 A. 628, 633.

not support. In expressing criticism of the school bus statute because literally "all" school children in Alaska are not afforded transportation, it unjustifiably imputes to the legislature fictitious motives, and usurps the legislative prerogative of determining what is appropriate or necessary for the public good. In pointing out that weather and traffic hazards are as detrimental to the non-public school children who are not entitled to transportation under Chapter 39 as to those who do qualify for the assistance given by the statute, it suggests the existence of an unfair discrimination; and then in ultimately denying bus transportation to all non-public school children, it compounds the very discrimination which it appears to deplore. In construing the constitution so narrowly and constrictively, it saps the strength and takes the meaning from the classic statement of human rights in the first article, that "This constitution is dedicated to the principles * * * that all persons are equal and entitled to equal rights, opportunities, and protection under the law * * *." In permitting a child to ride a school bus only on the condition that he attends a public school, it has the coercive effect of restricting the natural right of parents, acting in accordance with their legitimate preferences, to direct the education of their children; and thus it disregards the fundamental theory of liberty which excludes any general power in the government to standardize the education of children.

1. *The Alaska Organic Act.*

The Organic Act prohibited the appropriation of public money for the "support or benefit" of a private school.[1] The state constitution prohibits the payment of money from public funds for the "direct benefit" of any such school.[2] I am convinced that Chapter 39 confers no benefit of any kind on the private school, and therefore is a valid legislative enactment whether tested under the Organic Act or the constitution. But I submit that the court has established a harmful rule of construction in measuring the validity of an existing statute against an organic law which no longer existed after Alaska became a state.[3]

It is an established doctrine of American jurisprudence that a legislative enactment is presumed to be valid and constitutional,[4] and that the final authority in determining whether this is so is vested in the judiciary.[5] If this doctrine has any significance at all it means that a statute, until declared invalid by a court, is an operative fact. The act involved here was so considered. Since its enactment in 1955, and at the time the state constitution became effective, it was in operation; it was respected and obeyed by those charged with the duty of executing the laws. It is in effect now. This is as it ought to be.[6]

If at the time the constitution became operative the presumption of validity still attached to Chapter 39, and it was recognized by all concerned as something that existed and had meaning, rather than as a nullity or something that did not exist, then I submit that it was a law "in force" within the meaning of article XV, section 1. So long as it was consistent with the constitution it was intended to continue in force until it expired by its own limitations,

1. 37 Stat. 514 (1912), 48 U.S.C.A. § 77 (1952).

2. Alaska Const. art. VII, § 1.

3. Alaska became a state on January 3, 1959. Exec.Proclamation No. 3269, 24 Fed.Reg. 81 (1959), 48 U.S.C.A. note preceding section 21, Alaska Statehood Act, 72 Stat. 339 (1958), 48 U.S.C.A. preceding section 21. At that moment the State Constitution became effective and superseded the Alaska Organic Act.

4. 1 Willoughby, Constitutional Law, § 26 at 42–43, and § 27 at 47 (2d ed. 1929).

5. Marbury v. Madison, 1803, 1 Cranch 137, 177–178, 5 U.S. 137, 177–178, 2 L.Ed. 60, 73; Pollock v. Farmers' Loan & Trust Co., 1895, 157 U.S. 429, 554, 15 S.Ct. 673, 39 L.Ed. 759, 810; 16 C.J.S. Constitutional Law § 92.

6. See Wall v. Close, 1942, 201 La. 986, 10 So.2d 779, 783.

or was amended or repealed. The only restriction or limitation was that such a law be in harmony with the constitution; it was not required that it also be consistent with the Territorial Organic Act. Logically, then, this means that the validity or constitutionality of such a statute was thereafter to be tested only against the limitations set forth in the new state constitution.

The delegates to the Convention were not framing an organic law for people entering into political society for the first time, but rather for a community already organized with existing laws. It can be presumed that they knew the nature and effect of those laws. They felt it unnecessary and impracticable to provide for the enactment of an entire new body of law for the state when existing statutes would in most instances suffice. Consequently, they did what was only reasonable and practical; they provided for the continuation of Territorial laws where they were in harmony with the constitution. They thus established for the state a system of statutory law with the same legal effect as if those statutes had been re-enacted by the legislature for the state [7]—that branch of the state government which derives all of its authority from the constitution.

The statutes thus adopted by reference were those that were "in force" on the effective date of the constitution. The majority says that the dictionary gives the word "valid" as one of the definitions of the phrase "in force". But the dictionary also states that the phrase means "operative." [8] It is more reasonable to assume that this is what was intended. The delegates could not determine which laws were valid and which were not. If Territorial laws existed and had not been declared invalid by a court, then they were operative—they were in force. It would be presumed that they were also valid.

The construction adopted by the majority of this court can be explained only on the theory that if an act of the legislature was invalid under the Organic Act it was not a law; it was inoperative, conferred no rights, imposed no duties and afforded no basis for actions taken under it. [9] If such a broad statement is universally true, it would logically follow that something that was not a law at the time of enactment could not be a law in force at the time the constitution became effective. [10]

But it has been found that this statement must be taken with qualifications. Professor Willoughby recognized this some thirty years ago. He spoke of "circumstances under which legal rights or obligations or consequences are attached to a legislative enactment which is later held to be unconstitutional", and stated that "the retroactive force of the judicial pronouncement as to unconstitutionality is not complete." [11] The courts, too, have seen the problem. The Court of Appeals for the Third Circuit, in speaking of a taxing statute, said:

"Accepting the unconstitutionality of the act of 1929, as determined by the Supreme Court of the State, it was none the less a statute under which the school district acted when it levied its taxes for the years 1937 and 1938." [12]

The Court of Appeals for the District of Columbia, after referring to the belief that

---

7. See People ex rel. McClelland v. Roberts, 1895, 13 Misc. 448, 34 N.Y.S. 641, 650, affirmed in 1896, 148 N.Y. 360, 42 N.E. 1082, 1085, 31 L.R.A. 399.

8. Webster, New International Dictionary, Unabridged, at 986 (2d ed. 1960).

9. Norton v. Shelby County, 1886, 118 U.S. 425, 442, 6 S.Ct. 1121, 30 L.Ed. 178, 186; Chicago, I. & L. R. Co. v. Hackett, 1913, 228 U.S. 559, 566, 33 S.Ct. 581, 57 L.Ed. 966, 969.

10. Ex parte Bustillos, 1920, 26 N.M. 449, 194 P. 886, 889.

11. 1 Willoughby, Constitutional Law, § 8 at 11 (2d ed. 1929).

12. Phipps v. School District of Pittsburgh, 3 Cir., 1940, 111 F.2d 393, 395. And see also J. A. Dougherty's Sons, Inc. v. Commissioner of Internal Revenue, 3 Cir., 1941, 121 F.2d 700, 702.

if an act is declared unconstitutional it never had any force or effect, said:

" * * * Yet a realistic approach is eroding this doctrine. * * *"[13]

The principle, and the problem, has perhaps been most explicitly stated by Mr. Chief Justice Hughes when, in speaking for a unanimous court, he said:

"It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,—with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. These questions are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified. * * *"[14]

There are, indeed, difficult questions, as the Chief Justice stated. Adherence to the rule of absolute retroactive invalidity might well have undesired consequences in this case. It could mean that if Chapter 39 were not really a law when it was enacted in 1955, every action taken under it was invalid, unlawful and without meaning. Monies used to transport children who did not attend the public school were illegal expenditures. In fairness to Alaska taxpayers, those monies should now be recovered by the state.

But this raises serious problems. From whom, for example, would the state seek recovery of those expenditures? Would it be the Commissioner of Education whose duty it was under Chapter 39 to administer the statute? Would it be the school bus contractor to whom the monies have been, and are now, being paid? Or would it be, perhaps, the child who rode the school bus, at public expense, in violation of the Organic Act and the constitution?

I would doubt that the executive branch of our government, which has so successfully assailed the validity of the statute, would choose to go that far. But if it did not, then it places itself in the inconsistent position of saying on one hand that the act was a nullity, of no force and effect whatever, and on the other hand in saying that it really did have some operative force prior to the effective date of this court's judgment declaring the statute invalid. If it is considered that the past may not be disturbed because, e. g., rights have become vested or because prior determinations deemed to have finality have been made or perhaps even because of considerations of broad public policy, then in all fairness there should be recognized the operative force of Chapter 39 at the time the constitution became effective and the fact that it was a law "in force" within the meaning of article XV, section 1.

Another striking incongruity is found in the court's holding that it is not bound by the decision of the United States Supreme Court in the Everson case.[15] If Chapter 39 was void on the day of its enactment, as the majority says it was, then to be con-

13. Warring v. Colpoys, 1941, 74 App.D.C. 303, 122 F.2d 642, 646, 136 A.L.R. 1025.

14. Chicot County Drainage District v. Baxter State Bank, 1940, 308 U.S. 371, 374, 60 S.Ct. 317, 318, 84 L.Ed. 329, 332–333. See also National Labor Relations Board v. Rockaway News Supply Co., Inc., 1953, 345 U.S. 71, 77, 73 S.Ct. 519, 97 L.Ed. 832, 837.

15. Everson v. Board of Education, 1947, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711.

948

sistent the court should recognize the status, as it then existed, of the judicial system which had the power to determine whether the act was void under limitations found in the Organic Act.

In 1955 Alaska was a Territory. Its judiciary consisted of one district court, created by act of Congress.[16] That court was bound to follow the law as laid down by the United States Supreme Court; it was not free to disregard a pertinent decision of the Supreme Court if it felt, as the majority does here, that such decision was unpersuasive.[17]

In Everson it was held that use of New Jersey's general fund to pay for transportation of children to parochial schools was not a violation of the first and fourteenth amendment to the federal constitution. The court found that those monies were used for a public rather than a private purpose, and that they did not have the effect of supporting the parochial schools. It is manifest, also, from what the court said that no benefit was considered to have been conferred upon such schools, and that if it had, the decision on the constitutional questions would have been the other way.

That decision, then, would have been controlling if the validity of Chapter 39 had been determined by the Territorial District Court. That court, regardless of the personal views of a particular judge, would have been required to hold that the use of public monies to provide transportation of children to non-public schools neither supported nor benefited such schools. Chapter 39 would, of necessity, have been declared to be a valid act of the Alaska Legislature and not contrary to the Territorial Organic Act.

This demonstrates the incompatible positions that this court has taken. In order to justify its assumed right to test the validity of Chapter 39 against the now non-existent Organic Act, it says that one must go back in time and ascertain whether the act would have stood up under limitations found in the organic law of the Territory of Alaska. But it chooses to ignore a logical condition of utilizing such approach—that of also measuring the validity of Chapter 39 against restrictions on judicial pronouncements then imposed upon the Territorial District Court. This court reaches into the past to resurrect the Organic Act; it then returns to the present to assume the prerogative of a state court, not bound in a matter like this to follow a pertinent decision of the United States Supreme Court.

If the court insists on applying the rule as to absolute retroactive invalidity, then I submit it should be applied in its entirety. If this is done, it would be readily apparent that Chapter 39 was a "law in force", within the meaning of the constitution, and that the Alaska Organic Act has no bearing at all on the issue in this case.

### 2. *Constitutional History.*

If all relevant proceedings of the Constitutional Convention are considered, it will be abundantly clear that the "direct benefit" proscription in article VII, section 1, was not meant to preclude public transportation of children attending non-public schools. This court, however, refuses to attach importance to any of such proceedings. It takes the position that it was left to the court to decide whether free transportation of children to non-public schools would constitute a direct benefit to the schools, and that if the delegates to the Convention had intended otherwise they would have made specific provision in the constitution for such transportation. In short, the majority sets no value on constitutional history in determining constitutional intent.

That, I think, is unsound. The words "direct benefit" require definition; if they

---

16. 31 Stat. 322 (1900), 48 U.S.C.A. § 101.

17. Lindeberg v. Howard, 9 Cir., 1906, 146 F. 467, 472, 2 Alaska Fed. 597, 604; Kroeger v. Twin Buttes R. Co., 1911, 13 Ariz. 348, 114 P. 553, 554; Hawaiian Tuna Packers v. International L. & W. Union, D.C.D.Haw.1947, 72 F.Supp. 562, 565. See also Missouri, K. & T. Ry. Co. v. Walker, 1911, 27 Okl. 849, 113 P. 907, 908.

did not, this case would not be before the court. In such a case it is entirely proper and perhaps even necessary to have recourse to extrinsic evidence in order to ascertain the meaning which those words had at the time the constitution was written and adopted.[18] An important source of such evidence would be found in the history of events which led up to the adoption of the section where the words were used, and this history would include the recorded proceedings of the Constitutional Convention.[19] As the United States Supreme Court said with respect to the Federal Constitution:

"The necessities which gave birth to the Constitution, the controversies which preceded its formation, and the conflicts of opinion which were settled by its adoption, may properly be taken into view for the purpose of tracing to its source any particular provision of the Constitution in order thereby to be enabled to correctly interpret its meaning. * * * " [20]

The court points out that motions and debates do not necessarily indicate the purpose of the majority of a convention in adopting a particular clause. But the point that I make is that if there are other convention proceedings, in addition to motions and debates, which clearly show the purpose of the provision in question, that this furnishes a valuable and satisfactory aid to interpretation which should not be ignored.

At the Convention in November 1955 delegates Johnson and Coghill introduced Delegate Proposal No. 6 which dealt with the subject of education. Section 7 provided in part:

"No public funds * * * shall be used directly or indirectly for the sup-port, operation or maintenance, *including transportation and other auxiliary services,* for any schools or children therein except those Public Schools under the exclusive supervision and direction of the State." [21] (Emphasis added.)

On December 15, 1955 the Committee on Preamble and Bill of Rights submitted a report to the Convention and transmitted an article on health, education and welfare. This report stated that Delegate Proposal No. 6 had been considered and that "the Committee adopted sections 3 and 7 with some changes." [22] Section 7 of that proposal, as modified by the committee, appeared in the last sentence of Section 1 of the committee's article on health, education and welfare, and read:

"No money shall be paid from public funds for the direct benefit of any religious or other private educational institution."

This is identical with the last sentence of article VII, section 1 of the constitution.

The changes made by the committee are apparent and significant. Delegates Johnson and Coghill had wanted to prohibit the use of public funds for the direct or indirect support, operation or maintenance of non-public schools, and had specifically included "transportation and other auxiliary services." The committee changed this to a prohibition only against "direct benefit" to such schools, without mention of transportation or other auxiliary services. The meaning of this change is inescapable: the committee rejected the thought that transportation and other auxiliary services should be precluded by the ban against the use of public funds for the direct benefit of private schools. There is no question

18. 1 Willoughby, Constitutional Law, § 31, at 52 (2d ed. 1929).

19. 1 Willoughby, Constitutional Law, supra, at 52, and § 32 at 54. See also 2 Sutherland, Statutory Construction, § 5001, at 481 (3d ed. 1943). ·

20. Knowlton v. Moore, 1900, 178 U.S. 41, 95, 20 S.Ct. 747, 768, 44 L.Ed. 969, 991. See also Shelley v. Kraemer, 1948, 334 U.S. 1, 23, 68 S.Ct. 836, 92 L.Ed. 1161, 1186.

21. Alaska Constitutional Convention, Proposal No. 6, Education, November 17, 1955.

22. Alaska Constitutional Convention, Report of Committee on Preamble and Bill of Rights on Committee Proposal No. 7, December 15, 1955.

but that this was its intent. During debate on the floor the chairman of the committee stated, in answer to a question, that the committee had given Johnson and Coghill's proposal correct attention and rejected it permanently.[23] It obviously did not consider that transportation of children had any legitimate bearing on the support, operation or maintenance of a school or that it would constitute a direct benefit to a school.

This did not end the matter. When the committee proposal on education came to the floor of the convention, Delegate Coghill moved to amend the section involved so that not only direct, but also indirect benefit would be prohibited.[24] A portion of the debate that followed has been mentioned by the majority. But there was more that has not been referred to, and it merits consideration. It is revealing in showing that the convention thoroughly considered the implications of a prohibition against indirect benefit, and in showing, by a rejection of the proposed amendment, what was intended to be forbidden and what was not.

Delegate Ralph Rivers, in arguing against the amendment, pointed out what might be involved if indirect benefit were prohibited, i. e., the possibility of not being able to effectuate a legitimate public purpose because of incidental advantages that might result to a private concern. He said:

> "* * * if there is a public purpose for which money is to be expended it does not matter if some of it does result in an indirect benefit to some private concern, which may be a contractor; so I definitely don't want to see the words 'or indirect' inserted in this section."[25]

Delegate Coghill was asked how indirect benefits might accrue to a private school. He answered by saying that there would be nothing wrong with the state making "any social welfare, health arrangements * * * with any private or parochial institution", because they would be on a "contractual basis and would be providing a service to the public and not to the institution." He saw nothing wrong with providing a hot lunch program with Territorial money or providing a health program in a school, saying—

> "* * * I do not deny that to the private school because I feel that it is an instrument of public benefit because a child is benefiting from it from the public standpoint * * *."[26]

This is significant. If the author of the restrictive amendment considered that state health and welfare arrangements with a private school would not be banned by a prohibition against indirect benefit, then it is impossible to understand how state arrangements for transportation of children to the private school could amount to a direct benefit to such school.

On the other hand, Delegate Coghill appeared to contradict himself later. He was asked what effect the proposed amendment would have on children's foster homes which, in addition to caring for the bodily needs of children, also provided education. Delegate Coghill stated that the foster homes "would be deriving an indirect benefit of some sort or another."[27]

This statement must be considered in connection with a memorandum from the Director of the Alaska Department of Public Welfare which was then read to the convention. It listed the schools in Alaska, operated by private and religious organizations, to which the Territory was paying monies through the Welfare Department.[28] The delegates may well have believed, considering these facts along with Delegate Coghill's last statement, that to forbid any indirect benefit would be so prohibitive as to restrict the furnishing of needed welfare services.

23. Alaska Constitutional Convention Minutes, Jan. 9, 1956, p. 60.

24. Id. at 53.

25. Id. at 57.

26. Id. at 62–63.

27. Id. at 67.

28. Id. at 67–68.

When the proposed amendment finally came to a vote, it failed by 19 to 34. Delegates Coghill and Johnson, who had wished to prohibit bus transportation for children not attending public schools, voted in favor of the restrictive amendment. The entire committee which had formulated the section on education and had rejected the proposal of Delegates Johnson and Coghill voted against the amendment.[29]

Finally, in connection with a motion which was later defeated to strike all of the last sentence of the section on education, Delegate Victor Rivers asked why the committee had used the words "direct benefit" instead of "support or benefit." [30] A member of the committee, Delegate Armstrong, answered this as follows:

"As I recall, Mr. President, we probably discussed the question of the support but we did not feel it needed to be in this particular section, and I don't recall, Mr. Rivers, that we considered that as part of the text. I certainly would agree with what Miss Awes has said, although we discussed in Committee *such things as direct legislation for the building of a school or the maintenance of a private school, which would be support, but it was our understanding that that would be covered under this word 'direct benefit'. This would prohibit the direct appropriation or building and maintenance of private institutions."* [31] (Emphasis added.)

This shows clearly what the committee had in mind. It discloses the meaning of the words "direct benefit", i. e., the building or maintenance of private schools. It was not intended to preclude incidental aid that might result to a private educational institution as a by-product of the expenditure of public funds otherwise legitimate, such as those for health and welfare services.

I submit that this record of the convention proceedings merits the attention of the court. The proposal of Johnson and Coghill to prohibit bus transportation for a certain class of children, and its definite rejection by the committee and by the convention as a whole, certainly ought to be of great value in determining the meaning of "direct benefit" as it relates to school bus transportation. The discussion that took place on Coghill's motion to prohibit any indirect benefit, and its rejection by the convention, should make it clear that all the convention wanted to prevent was the use of public funds for the establishment and maintenance of other than public schools, or as Delegate Armstrong put it, for the "direct appropriation or building and maintenance of private institutions." The delegates realized that in attempting to effect a necessary good, such as the care and education of homeless children and the protection of their health and safety, that the state might not in all cases be able to avoid incidentally aiding other interests which could not be benefited by direct action. It did not wish such a possibility to frustrate the accomplishment of the common good. That is why only direct and not indirect benefit was prohibited.

It is abundantly clear that those who formed the constitution did not wish to stop the payment of public monies directly to a religious or other private institution that cared for needy children, even though such institution also furnished education for those children. But if this does not constitute a direct benefit to such institution, then I fail to see how there is a direct benefit to a parochial school if public funds are paid to a school bus contractor who allows the children to ride over established public school bus routes. If the latter involves an unlawful expenditure of public funds, as the majority holds it does, then so must the former. As a practical matter, this court has construed the prohibition against direct benefit so as to forbid also any in-

29. Id. at 70–71.

30. Id. at 76. "Support or benefit", not modified by "direct" or "indirect", is the language used in the Territorial Organic Act, as noted earlier in this opinion.

31. Alaska Constitutional Convention Minutes, Jan. 9, 1956, p. 76.

direct benefit. In so doing it has logically committed itself to a harmful and restrictive interpretation of the constitution which will prevent the legislature from effectuating legitimate and needed results in the field of general welfare.

### 3. *Benefit to the School.*

This court states flatly that the furnishing at public expense of transportation for a child who attends a non-public school constitutes a direct benefit to such school. This is a gratuitous assumption. It finds no justification in the language of Chapter 39. It finds no support in the record of this case and little, if any, support in the decisions of other courts. Considered purely as an assumption, it is irrational.

In Chapter 39 the legislature authorized transportation for children attending non-public schools on a substantially equivalent basis with children attending public schools. It did this for two clearly expressed reasons: to achieve the objectives of the Alaska compulsory education law, and to protect the health and safety of school children.

Both considerations were legitimate ones. A child could comply with the compulsory education statute by attending a private as well as a public school, and he would be excused from the statutory requirement if he lived more than two miles from a school and transportation was not furnished.[32] It made sense, then, to make transportation available to the child going to the private school in order to assure that the right of attending such a school, and thus to be in compliance with compulsory education requirements, would be real.

The protection of health and safety was no less a proper concern of the legislature. It is inconceivable that this could be challenged or denied. It is a matter of common knowledge that today's highways with today's motor vehicles are extremely dangerous, especially to children. Any rational person knows the hazards a child is subject to in walking long distances in extreme sub-zero weather, such as exists in the winter months in Fairbanks where this case arose. If proof is necessary, it can be found in the record. There was evidence of a dangerous thoroughfare, with no sidewalks, where children had to walk in order to reach the parochial school. There was evidence of winter temperatures in the vicinity of sixty degrees below zero. There was the incident of first and second grade children walking over one mile from school in weather so cold that two little boys involuntarily urinated and the urine froze to their underwear and clothing. There were cases where other parochial school children had suffered from frozen noses and toes.

These dangers to children are real and not illusory. The provisions made in Chapter 39 have a substantial relation to the public health, safety and welfare. The legislature had the right to concern itself with the needs of children—even those who exercised their constitutional right to attend other than a public school. It had no difficulty in expressing its will—in declaring a legitimate public interest. There was not left to the judiciary the task of imputing to the legislature an undeclared intent and purpose, such as that of aiding or benefiting private schools. It is not the prerogative of this court to say that the purpose of Chapter 39 is not what the legislature said it to be.

There is no evidence in this case creating the slightest inference that transportation of children benefits a school. Thus, the statement by this court that there is such a benefit is not a fact but a mere supposition. And as a supposition it is unwarranted.

The same indefensible assumption appears to have been indulged in by the New York Court of Appeals in Judd v. Board of Education, a decision upon which the majority of this court appears to rely. In that case it was said:

"* * * Free transportation of pupils induces attendance at the school.

---

32. § 37-7-1, ACLA 1949.

The purpose of the transportation is to promote the interests of the private school or religious or sectarian institution that controls and directs it. 'It helps build up, strengthen and makes a success of the schools as organizations.' * * * Without pupils there could be no school. It is illogical to say that the furnishing of transportation is not an aid to the institution while the employment of teachers and furnishing of books, accommodations and and other facilities are such an aid. * * * " [33]

I fail to see how it can be said that the purpose of transportation is to promote the interests of the private school. The legislature, in Chapter 39, has said that the purpose of transportation is to assist children in reaching their schools and to safeguard their health and safety.

I fail to see how one may properly assume that if transportation is not provided for children attending the Immaculate Conception parochial school at Fairbanks that the school would provide it at school expense. I could just as readily and properly assume that in this situation the parents would furnish transportation at their expense.

I do not see the justification for assuming that if a specified number of children dropped out of the parochial school because of lack of public transportation, that this would result in detriment to the school. One would be as justified in assuming that in such circumstances those children's places would be promptly filled by other children who had desired to attend but had been unable to because of crowded classrooms.

If public funds had been used for the construction or maintenance of the Fairbanks parochial school, then I could see where there would be a direct benefit to the school. But I fail to see where there is any benefit when public monies are spent, not for those purposes, but solely for the purpose of aiding children in getting to the school. It seems to me that as children are encouraged to attend school and are given assistance in getting there, there will be an increased need and demand for additional school facilities. This, logically, will result in additional cost to the school. Thus, the money spent by the state for transportation of school children cannot really benefit the school. The effect of such transportation, if more children will attend school when transported, will not be advantage and profit, but will be just the opposite—increased costs and expenses.

The practical holding in Judd was that as children are assisted in reaching school, there results an increased enrollment, and that this benefits the school because it would "build up", strengthen and make successful the school as an organization." [34] But even if it could be established that Chapter 39 had a substantial effect on the enrollment in the Immaculate Conception School at Fairbanks, this would not be a "benefit" in the constitutional sense. The fact that more children attend a school does not necessarily aid the school. In fact, I would think that this would have the opposite effect by increasing the demands on the school and the costs of operation. It would be only when the school was able to find ways of meeting those additional costs, without help from the state, that the results mentioned in the Judd case might be attained.

The transportation of children to school, whether it is by the parents or by the state, does not promote the advantage, prosperity or good of the school, despite the statement in the Judd decision that "without pupils there could be no school." An extension of this truism is that without a school there would be no expense of providing a school. I cannot see, then, the existence of any benefit, other than to the child and to society, in aiding the child in reaching a school which would not exist if children were not there to receive edu

33. 1938, 278 N.Y. 200, 15 N.E.2d 576, 582, 118 A.L.R. 789.

34. Judd v. Board of Education, supra note 33, 15 N.E.2d at page 582.

cation, and which would exist, if children were there, only at considerable cost.

In an effort to bolster its conclusion that transportation directly benefits a school the majority of this court also relies upon arguments made in minority, dissenting opinions in the Everson case— both in the New Jersey Court of Errors and Appeals [35] and in the United States Supreme Court.[36] I fail to see where those arguments aid this court in its conclusion. But if they are thought to be of assistance, then as applied to the issue involved here they amount in substance to this: (a) Payments made for text books, school lunches, athletic equipment, teachers' salaries, tuitions, buildings, equipment, and necessary materials presumably benefit the child. (b) But those payments also constitute a direct benefit to the school. (c) Therefore, since transportation directly benefits the child, it also directly benefits the school.

Such an argument, of course has no substance. It says that since certain things directly benefit both the child and the school, then other things related to education which directly benefit the child also must necessarily directly benefit the school —whether in fact this is so or not. Obviously this won't stand the test of logic.

In relying upon such unsound reasoning, I think the court has lost sight of what is really involved in this case. The point is not that payments for textbooks, school lunches, teachers' salaries, buildings, etc., do not constitute a direct benefit to the school. Those things are not involved in this action. What is involved, and the only thing, is whether transportation confers a direct benefit on a school. I say that transportation directly benefits a child and his parents; but that there is no basis in fact or reason for holding that it also directly benefits a school. That is the point.

In a final attempt to vindicate its claim that transportation of children confers a direct benefit upon a school, the court states that this was the view expressed by the courts of Delaware, New York, Oklahoma, Washington and Kentucky. I think that the decisions made by those courts furnish little, if any, support for the majority's point of view.

There are only two decisions that have any real pertinency, and they are of no assistance. In New York, aid or support to a religious school, "directly or indirectly", was prohibited by the constitution. In passing upon the validity of a transportation statute, the New York Court of Appeals obviously considered that transportation constituted an indirect and not a direct aid. The court said:

"Aid or support to the school 'directly or indirectly' is proscribed. The two words must have been used with some definite intent and purpose; otherwise why were they used at all? Aid furnished 'directly' would be that furnished in a direct line, both literally and figuratively, to the school itself, unmistakably earmarked, and without circumlocution or ambiguity. Aid furnished 'indirectly' clearly embraces any contribution, to whomsoever made, circuitously, collaterally, disguised, or otherwise not in a straight, open and direct course for the open and avowed aid of the school, that may be to the benefit of the institution or promotional of its interests and purposes * * * The purpose of the transportation is to promote the interests of the private school or religious or sectarian institution that controls and directs it." [37]

Similarly, in Oklahoma there was a constitutional prohibition against the use of

35. Everson v. Board of Education, 1945, 133 N.J.L. 350, 44 A.2d 333, 338–343.

36. Everson v. Board of Education, 1947, 330 U.S. 1, 47–49, 67 S.Ct. 504, 91 L. Ed. 711, 740.

37. Judd v. Board of Education, 1938, 278 N.Y. 200, 15 N.E.2d 576, 582, 118 A.L.R. 789, reargument denied 1938, 278 N.Y. 712, 17 N.E.2d 134.

public money for the use or benefit, directly or indirectly, of any sectarian institution. The Supreme Court of Oklahoma did say that "The appropriation and directed use of public funds in transportation of public school children is openly in direct aid to public schools 'as such'", and that when such aid was extended to a sectarian school there was a clear violation of the constitution.[38] But it followed this by also stating that its conclusion was "fully supported by the reasoning and conclusion" in the New York case of Judd v. Board of Education.[39] The Judd case furnished no such support, since its holding was that transportation conferred aid that was indirect, and not direct. Hence, the Oklahoma court's view that there was direct aid is not convincing.

Decisions of the courts of Delaware, Kentucky and Washington [40] are of even less value, since none of the constitutional provisions involved used either the words "direct" or "indirect." In addition, Washington relied in major part on the Judd decision, and Kentucky, upon the Gurney case in Oklahoma which in turn had based its conclusion on Judd.

The majority has failed to point to any clear cut decision of another court where there was directly involved the question of whether transportation amounted to direct or indirect aid to a school, and where the determination was made that it was direct aid. It was only in the Judd case that this was given any real consideration, and the decision there can be used only as precedent for a determination that transportation confers an indirect benefit upon a school. The Alaska constitution does not forbid that.

The holding that transportation of children, as authorized by Chapter 39, confers any benefit upon a school is indefensible, in fact and in reason. I submit that the majority of this court has rendered a judgment on social policy which properly should be left to the legislature. In practical effect the court has held that the legislature may not provide for the public welfare despite the fact that it possesses this authority, both traditionally and under the state constitution. The court does not have the power on such grounds to nullify a legislative act, for to concede the power would be to make the court sovereign over the legislature, the constitution and the people, and convert the government of this state into a judicial despotism.

4. *Legislative Purpose.*

The court is critical of one of the legislative purposes expressed in Chapter 39, i. e., the protection of the health and safety of all school children in Alaska. It points out that no transportation is provided for non-public school children who do not live along public school bus routes, nor for those children who live within one and one-half miles from the schools they attend.[41] The court concludes from this that Chapter 39 does not effectuate the announced legislative intent.

I do not know what purpose is served by this portion of the majority's opinion, unless it was intended to suggest by inference that the legislature had some ulterior motive in enacting the statute—its stated objective being a mere fiction—and that for this reason the act was not an appropriate exercise of police power or did not really serve a public purpose.

---

38. Gurney v. Ferguson, 1941, 190 Okl. 254, 122 P.2d 1002, 1004.

39. Id., 122 P.2d at page 1004.

40. State ex rel. Traub v. Brown, 1934, 6 W.W.Harr. 181, 36 Del. 181, 172 A. 835, writ of error dismissed 1938, 9 W.W. Harr. 187, 39 Del. 187, 197 A. 478; Sherrard v. Jefferson County Board of Education, 1942, 294 Ky. 469, 171 S.W. 2d 963; Mitchell v. Consol. School Dist. No. 201, 1943, 17 Wash.2d 61, 135 P.

2d 79, 146 A.L.R. 612; Visser v. Nooksack Valley School Dist. No. 506, 1949, 33 Wash.2d 699, 207 P.2d 198.

41. The Commissioner of Education is authorized by regulation to enter into contracts for the transportation of pupils "who reside a distance of one and one-half miles or more from the school they are required to attend." 4 Alaska Adm. Code § 100(a), at 37.

Long prior to the enactment of Chapter 39 transportation for school children was provided by virtue of a law conferring upon the Territorial Board of Education the power and authority to "Provide for the transportation of pupils who reside a distance from established Schools." [42] In its practical operation this statute was construed as applying to children attending public schools, but even here *all* public school children did not receive the benefits of the law. Under limitations prescribed by the Board of Education, children were permitted to ride school buses only if they lived beyond a certain distance from their schools, and other children were afforded no transportation if there were not a sufficient number of them living in a certain area to justify the establishment of a transportation route. This is precisely the situation contemplated by existing regulations of the Commissioner of Education. They provide that a transportation route may not be established where there are fewer than eight children who are residents living along a regularly maintained highway; that extensions to routes already established may not be made unless there are at least three children and the extension is a regularly maintained highway; that a route extension may not be established for a one-way distance of less than one mile; and that a transportation route must be discontinued if the average number of children transported falls to five or below for two consecutive months. [43]

Thus, the fact that literally "all" school children in Alaska were not given transportation under Chapter 39 is not a circumstance peculiar to children attending non-public schools. It is applicable to the same extent to children attending public schools. It is apparent, then, that when the legislature in 1955 for the first time extended the assistance of transportation to non-public school children, and spoke of "all school

children in Alaska", it was expressing its legitimate concern for a class of children who up to that time had been discriminated against. The phrase "all school children" obviously was intended to refer to the fact that all children, regardless of whether they attended a public or non-public school, were entitled to transportation if they were otherwise qualified under applicable regulations of the Board or Commissioner of Education. It was never intended that children attending non-public schools would receive benefits over and above those accorded the children attending public schools. If this had been the effect of the statute, there is little doubt but that the court would be even more critical of such an arrangement because of the resulting discrimination against public school children.

The majority, therefore, is not justified in stating that Chapter 39 does not effectuate the intent of the legislature expressed therein. But even if this were so as it relates to health and safety, the statute still would not fail for a lack of a proper legislative motive. The act does not relate only to health and safety; one of its declared purposes is to "achieve the objectives of the compulsory education laws of Alaska." [44] This alone would be a sufficient consideration; for legislation intended to facilitate the opportunity of children to get to school, both public and non-public, serves a distinct public purpose. [45]

The majority makes a further attempt to justify its criticism of the legislative objective by stating that neither inclement weather nor highway traffic hazards were used as a justification for the first law passed in Alaska to provide transportation for school children. The court states that distance from school seems to have been the motivating force for legislation at that time.

I have no quarrel with the proposition that distance may have been a prime factor.

42. SLA 1933, ch. 114, § 1 (§ 37-2-8, ACLA 1949).

43. 4 Alaska Adm.Code § 100(a), at 37.

44. SLA 1955, ch. 39, § 1.

45. Everson v. Board of Education, 1947, 330 U.S. 1, 7, 67 S.Ct. 504, 91 L.Ed. 711, 719; Snyder v. Town of Newtown, 1960, 147 Conn. 374, 161 A.2d 770, 774, appeal dismissed 81 S.Ct. 692, 5 L.Ed.2d 688.

But this does not mean that health and safety were not legitimate factors. If one thinks only a little about winter weather conditions and the hazards of automobile traffic, it should be apparent that as the distance a child must travel by foot increases so do the hazards to his safety. Distance bears such a real and substantial relation to health and safety that the two cannot be considered as separate motivating forces which influence legislatures to provide transportation for school children. In the light of realities of contemporary living, it is astounding that the court would suggest that health and safety were not factors which the legislature had in mind in authorizing transportation of school children at public expense.

Chapter 39 in fact has a real and substantial relation to the health, safety and welfare of school children, despite the majority's suggestion to the contrary. This court is not justified in denouncing the legislative motive or the legislative arrangement because literally "all" school children in this state are not transported to their schools. The legislature may do what it can to accomplish what is deemed necessary for the public welfare, and stop short of those cases where the detriment to a few, not afforded state aid, is considered less important than the expense or inconvenience to the state which might result if the rule laid down were mathematically exact. Transportation of school children is an expensive undertaking[46], and the legislature may well have felt that the state could not afford to provide transportation for every child in the state and for every distance traveled. "The problems of government are practical ones and may justify, if they do not require, rough accommodations,—illogical, it may be, and unscientific."[47] It is not within the proper scope of judicial review for this court to sit as a superlegislature and decide whether the statute is fair or unfair, or wise or unwise, or whether it has gone far enough in accomplishing a public purpose.[48]

5. *Conclusion.*

The basic, underlying controversy which gave rise to this litigation is not disclosed by the briefs or by the opinion of this court. But it does exist and should be recognized.

Those who would deny transportation for children attending non-public schools are not concerned with transportation as such. Nor are they truly solicitous about the relatively minor expense to the state which will result from the operation of Chapter 39.[49] Their real anxiety, and the real issue in this case, has to do with the very existence of the sectarian or religious educational institutions, and the belief of some persons in the supremacy of public education administered and controlled by the state.

This was evident from proceedings of the Constitutional Convention. Delegate Proposal No. 6, mentioned earlier in this opin-

46. See note 49, infra.

47. Metropolis Theater Co. v. City of Chicago, 1913, 228 U.S. 61, 69, 33 S.Ct. 441, 443, 57 L.Ed. 730, 734.

48. Day-Brite Lighting Co. v. State of Missouri, 1952, 342 U.S. 421, 423, 72 S.Ct. 405, 96 L.Ed. 469, 472; Berman v. Parker, 1954, 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27, 37; California State Auto Ass'n, etc. v. Maloney, 1951, 341 U.S. 105, 110, 71 S.Ct. 601, 95 L.Ed. 788, 793; Watson v. Buck, 1941, 313 U.S. 387, 403, 61 S.Ct. 962, 85 L.Ed. 1416, 1425; Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 394, 60 S.Ct. 907, 84 L.Ed. 1263, 1272.

49. The appellants have furnished this court with a copy of a memorandum, dated April 27, 1960, from Dr. Theo J. Norby, Commissioner of Education, to Ralph E. Moody, Attorney General of Alaska. This memorandum indicates that if the lower court's decision had been upheld, the additional expense of providing transportation for non-public school students in 1961 would be $17,937.25. It is interesting to note that the total legislative appropriation for "pupil transportation" in 1960 was $1,197,197.00 (SLA 1960, ch. 182, § 1, at 289), and that the amount requested in the Governor's budget for fiscal year 1961-62 was $1,300,000 (House Bill 42, First Session, Second Alaska Legislature, 1961, at 6).

ion, did not deal solely with the subject of the use of public funds for private schools. That proposal spelled out in detail how education should be handled in the new State of Alaska. Section 2 provided that "The State's responsibility for the education of its people is here declared to be clear, positive and final." Section 4 would have required the legislature to provide "for the compulsory attendance at some public school, unless other state approved means of education are provided." Section 6 would have permitted the legislature to provide "for the establishment of private schools by individuals, groups, institutions or corporations", but only "under charter from the state." That section also would have required the state to establish undefined "minimum educational standards for such schools", and would have allowed the teaching in private schools of principles over and above the state requirements, provided that such teachings "were not otherwise contrary to the statutes or the constitution of the state."

During debate on the floor of the convention, Delegate Coghill, a co-author of proposal No. 6, stated that he was President of the Association of Alaska School Boards and "one of the framers of that twelve-point program we developed in Anchorage last October." [50] That program, which had been widely disseminated among the delegates, was a five page document entitled "Basic Principles of Education to be Included in the Constitution for the State of Alaska", and it stated that it had been formulated and approved by the Alaska School Boards Association and the Superintendents' Advisory Commission at a meeting in Anchorage in October 1955. Since the recommendations and discussion in this document coincide in relevant part with Delegate Proposal No. 6, it is fair to presume that those portions of the proposal discussed here reflected the philosophy of education, not just of the delegates who submitted the proposal, but also of the official representatives of public education in Alaska.

The basic thesis which runs through the proposal is that education is primarily, if not exclusively, the prerogative and function of the state; that the state is supreme in this field. Evident is the clear implication that the state should have the right to determine in the first instance whether a private school should even be allowed to exist, and if so, then what it should or should not be permitted to teach. Perhaps there is even implicit here a resentment or fear toward the existence of the private schools—a thought that was revealed by Delegate Coghill when, during debate on the floor of the convention, he said that "sectarianism segregation in our educational system is bad for the children",[51] and "The people that are sending their children to private parochial or any other type of institution are segregating themselves from the public and therefore they should not derive the benefit from the tax dollar." [52]

Such a philosophy of education was totalitarian in concept; the objective obviously being to standardize children by forcing them, practically, to accept instruction from public school teachers only. It ignored the fact that the child is not the mere creature of the state; it denied the natural right of parents to direct the destiny of their children. It had no proper place in the organic law for the State of Alaska, as the convention ultimately decided by rejecting the proposal.

That constitutional history is important to consider in the background of the present controversy over bus transportation. The effort to place all education under the complete dominion of the state failed to succeed as a constitutional measure. The United States Supreme court's decision in Pierce v. Society of Sisters, 1925, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, was a bar to any possible legislative enactment that would compel attendance at public schools only. The next logical step, then, was to

---

50. Alaska Constitutional Convention Minutes, Jan. 9, 1956, p. 58.

51. Id. at 59.

52. Id. at 64.

restrict as far as possible the enjoyment of the right to education not exclusively controlled by the state. The opponents of the right thus sought to bar the extension of general welfare benefits to children who did not attend a public school by attempting to insert a constitutional provision against the use of public funds for any indirect benefit to a private school. They were unsuccessful at the convention, but their defeat has now been turned into victory by the court's decision in this case.

In the Pierce case the Supreme Court of the United States held that a statute which compelled attendance at public schools unreasonably interfered with the liberty of parents and guardians to direct the upbringing of children under their control. The court said:

> "The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." [53]

This liberty of parents to choose the kind of education to be given to their children, so clearly stated in Pierce, has lost much of its effectiveness and meaning by the majority's decision in this case. Because of the economic and social realities of contemporary living, there undoubtedly will be parents who will now find it impracticable or impossible to continue sending their children to the parochial school. To them, the constitutional and natural right to educate their children in schools of their own selection, and to thus express their conviction of the importance of religious and spiritual ideals in the formation of character, will be an abstract thing, without practical meaning or value.

The transportation of school children provided by Chapter 39 is a benefit common and necessary to public and non-public school children alike. To grant this assistance to some children, and deny it to others unless they forego their freedom of choice of schools, embodies the element of unfair treatment which is so foreign to our American tradition. The concept of liberty and equality of man was expressed in the high purpose and noble convictions of our forefathers who signed the Declaration of Independence. It was again given expression with classic dignity by the men and women who formulated the constitution for the State of Alaska when they said that "This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; * * *." [54]

This truly is the American idea—the American tradition. It is the reason for our nation's being; it has been America's strength. But today in Alaska that idea has become an abused phrase. The reality behind it has been obscured by the court's decision in this case; some of its power and meaning have been lost. Those persons who exercise their inherent right to direct the destiny of their children must now pay the price of being denied the equal rights to which the constitution says they are entitled.

This court's decision is a grave injustice to many citizens of this state.

The judgment below should be affirmed.

53. Pierce v. Society of Sisters, 1925, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070, 1078.

54. Alaska Const. art. I, § 1.